2007 WY 85

**Inocencio RAMOS, Appellant (Petitioner),**

v.

**STATE of Wyoming, ex rel., WYOMING WORKERS' SAFETY AND COMPEN-SATION DIVISION, Appellee (Respondent).**

No. 06–100.

Supreme Court of Wyoming.

May 22, 2007.

Representing Appellant: Hampton M. Young, Jr., Casper, Wyoming.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; Steven R. Czoschke, Senior Assistant Attorney General; Kristi M. Radosevich, Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1]   Over ten years before Inocencio Ramos sustained facial bone fractures in a work-related accident on August 26, 2003, as an employee of Knighten Well Service, he had periodontal disease and had been advised by a dentist to have his teeth extracted and replaced with dentures, but he had decided not to do so.  Following his work-related injury, he was evaluated by another dentist for chronic jaw pain and had his teeth extracted and replaced with dentures to relieve that pain.  The Wyoming Workers' Compensation Division (Division) denied payment of three bills totaling $2,470.00 for that dental treatment; Mr. Ramos requested a hearing; and, after the hearing, the Office of Administrative Hearings (OAH) hearing examiner upheld the Division's denial.  The district court affirmed the hearing examiner's decision.

[¶ 2] On appeal, Mr. Ramos contends that the hearing examiner's decision was arbitrary and capricious and not in accordance with the law as it failed to consider whether the work-related injury combined with the preexisting periodontal disease necessitated the dental treatment for which compensation was sought. Responding to those contentions, the Division asserts that substantial evidence supports the hearing examiner's decision that the dental treatment in question was necessitated by Mr. Ramos' preexisting periodontal disease, not the work-related injury.

[¶ 3] Applying the arbitrary and capricious standard of review, we hold that the hearing examiner's decision must be reversed, that Mr. Ramos proved by a preponderance of the evidence that his work-related injury combined with his preexisting periodontal disease necessitated the dental treatment in question, and that this case is remanded with instructions that the hearing examiner's order be vacated and a new order be entered awarding payment of the dental bills in question.

## FACTS

### I. *Procedural History*

[¶ 4] On September 4, 2003, Mr. Ramos filed an injury report with the Division in which he reported he sustained injury to his face and jaw on August 26, 2003, when a work tool struck him on the right side of his face while working for Knighten Well Service. The Division paid for medical treatment related to this injury. On May 14, 2004, the Division received three bills totaling $2,470.00 from Dr. Arnie G. Sybrant for teeth extractions and dentures replacement he performed on Mr. Ramos in April and May 2004. On June 8, 2004, the Division issued three Final Determination letters to Dr. Sybrant in which it denied payment of those bills for the reason that the dental services were not related to the August 26, 2003, work-related injury. On June 10, 2004, Mr. Ramos requested a contested case hearing, and two weeks later the Division referred the case to the OAH. On December 9, 2004, the hearing examiner conducted the hearing.

[¶ 5] At the outset of the hearing, the hearing examiner explained that both Mr. Ramos and the Division had the same or similar exhibits which included Dr. Sybrant's notes and records and the Division's denial letters; the hearing examiner admitted these exhibits into evidence without objection. Mr. Ramos' counsel made an opening statement and the Division's counsel waived opening statement. Mr. Ramos' counsel presented three witnesses, namely, Dr. Sybrant, Mrs. Ramos, and Mr. Ramos, and the Division's counsel cross-examined them. Following the presentation of Mr. Ramos' evidence, the Division's counsel moved for a directed verdict, which the hearing examiner denied. The Division did not present any witnesses. The hearing examiner declared the evidence closed and invited counsel's closing arguments. Mr. Ramos' counsel made no closing argument, having previously argued against the Division's motion for directed verdict. The Division's counsel made a closing argument, after which the hearing examiner took the matter under advisement. On January 5, 2005, the hearing examiner issued his decision in the form of an order denying payment for Dr. Sybrant's three bills, finding and concluding that Mr. Ramos had not proven that his work-related injury caused the need for Dr. Sybrant's dental treatment and that the need for that dental treatment was Mr. Ramos' preexisting periodontal disease which had been diagnosed a decade before the work-related injury.

[¶ 6] On February 24, 2006, the district court affirmed the hearing examiner's order, determining that substantial evidence supported that order. Mr. Ramos timely filed his notice of appeal.

### II. *Hearing Facts*

[¶ 7] About ten years before Mr. Ramos sustained the work-related facial injuries working for Knighten Well Service, Mr. Ramos was told by a dentist named Dr. Mathisen that he needed to have all of his teeth removed because he had advanced periodontal disease. Dr. Sybrant testified that periodontal disease is the result of the buildup of bacterial plaque on the surface of the teeth

which, over time, causes degeneration of the soft gum tissues around the teeth and eventually loss of the bone structures that support the teeth; in the advanced stages, the teeth become abscessed because there is so much infection from the bacteria around them, and, at that point, once the teeth have lost a substantial amount of bone, the only treatment for it is to have the teeth removed. According to Dr. Sybrant, the cause of the disease is lack of good home care and regular professional care.

[¶ 8] According to Mr. Ramos, in the years between Dr. Mathisen's advice and the work accident some of his teeth were loose and fell out, his jaw structure was normal, he had no difficulty eating, and he had no problems being able to open his mouth. According to Mrs. Ramos, before the work accident her husband had some loose teeth and had no problem eating steak or jerky, he had no problem talking, and rarely had headaches.

[¶ 9] On August 26, 2003, while working for Knighten Well Service, Mr. Ramos was using a pipe wrench and cheater bar when the pipe wrench slipped and the cheater bar struck him in the face. Mr. Ramos' injuries were a depressed fracture of the right zygoma with an undisplaced fracture of the zygomatic arch and a blowout of the orbit along the neurovascular canal. Mrs. Ramos testified that the work accident broke the right side of her husband's face in six places under the eye socket, down the cheekbone, down toward the jaw and a plate was put in to pull the bone together. According to Mrs. Ramos, right after her husband's work accident, he could not open his mouth far enough to see inside and he could only eat soft "liquidy" foods; his problem with eating was he could not open his jaw; it was a jaw problem, not a teeth problem. She testified her husband had severe pain in his face and jaw on the right side. According to Mr. Ramos, after the work accident he was unable to open his jaw and talk well and was having pain in his jaw.

[¶ 10] Dr. Joseph Vigneri surgically repaired Mr. Ramos' facial injuries, and the Division paid for that medical treatment. On January 20, 2004, Dr. Vigneri referred Mr. Ramos to Dr. Sybrant for evaluation of the chronic pain that Mr. Ramos was experiencing on the right side of his face. Dr. Sybrant's notes of his examination of Mr. Ramos on that initial visit reveal in pertinent part:

> ... can't open mouth & has pain all the time upper right side teeth. Can't push on face tender under eye. Constant headaches on right side, feels sick all the time, dizzy but goes away. Advised patient to stop chewing gum.... Missing teeth # 24–26, 17–19, 13, 9 & 10. MSO = 23.8 mm. Pt. needs teeth stabilized before anything could be done. Several loose teeth.... Patient has advance perio, all teeth mobile.... Good reason to suspect that he has pain due to periodontal abscesses. Possible that if dentures can be made with his limited MSO, it *could* alleviate a lot of his pain. Pt. told to chew gum as therapy. I told him to stop due to perio as well as TMJ symptoms. Dental conditions must be dealt with *first* then see what can be done about limited opening ability & TMJ symptoms.

On January 28, 2004, Dr. Sybrant wrote to the Division outlining the problems and possible treatment alternatives for Mr. Ramos. In pertinent part, Dr. Sybrant wrote:

> I explained to Mr. Ramos how temporomandibular dysfunction (TMD) is treated but in his case there are other factors that must be considered.
>
> In order to treat any TMD, a stable intraoral environment is required. In this case, it appears Mr. Ramos will require serial extraction of his teeth and fabrication of dentures. He was informed by his former dentist, over ten years ago, that he needed to have all of his teeth removed due to advanced periodontal disease. Treatment for TMD entails careful determination of the proper bite relationship. I hope to determine the best bite for correction of Mr. Ramos TMD symptoms and incorporate that into the immediate dentures. The result should be a correction for his dental problems as well as stabilization of his TMD symptoms.
>
> There is also the possibility that his pain is partially due to the infection from the periodontal disease. Removal of his re-

maining teeth could alleviate a significant portion of his pain symptoms.

Initially, I need to do a Panoramic Radiograph. This xray will be necessary for both dental and TMD treatment. The xray plus a dental examination will determine the extent of his periodontal disease. At that point the best solution will be prescribed. In stabilization of the stomatognathic relationship can be obtained concomitant with the fabrication of full dentures, then the patient could possibly be treated with less time and effort.

[¶ 11] At the contested case hearing, both Mr. Ramos' counsel and the Division's counsel questioned Dr. Sybrant. On direct examination by Mr. Ramos' counsel, Dr. Sybrant explained Dr. Vigneri's referral for pain evaluation, recounted Mr. Ramos' significant advanced periodontal disease, and commented on Mr. Ramos' limited ability to open his jaw and the pain associated with his effort to open his mouth. When asked if Mr. Ramos' headaches could have been the result of an unstable jaw, Dr. Sybrant answered:

I think that a lot of the pain he was going through, the physical pain, was from the infection from the periodontal disease. Normally that will cause a lot of pain in the facial area, simply because there is so much infection.

His symptoms were somewhat limited to the right-hand side of his face, where apparently he had had some damage. But at the same time, I have no reason to believe that the advanced periodontal condition would not at least be a contributing factor in how much discomfort he was going through.

When asked whether, as a medical probability, the facial injury could have increased the pain with the periodontal disease, Dr. Sybrant answered:

From what I can determine, he had a rather substantial injury, which was apparently repaired by Dr. Vigneri. That could have triggered the infection to become worse in these areas, because he had to have the surgery.

* * * *

The periodontal disease is obviously connected very closely to the bones and areas where he was having the surgery done, and it could have just kind of stirred everything up at that point and made it a lot worse for him suddenly. The problem was there before, but that may have set it off and caused it to become more of a problem.

When asked in cross-examination by the Division's counsel if it would be speculating to say that the work accident caused "more of this problem" (referring to advanced periodontal disease), Dr. Sybrant answered:

I think I would have to say yes to that. My opinion was, I wanted to treat his dental problems, because we had no choice but to do that before we could even go on.

* * * *

We had to get a stable dental environment before we could even consider doing anything as far as evaluating the jaw situation.

Q. [Division's counsel] And he didn't have a stable dental environment even before the accident, did he?

A. Not [at] that point. The hope was . . . to be able to correct both simultaneously. The hope was to thereby stabilize the jaw, give more support for the jaw joint mechanism where he was getting a lot of pain.

Q. But this pre-existing periodontal disease was going to require him to have his teeth removed—

A. Yes.

Q. —which should actually have been done years before?

A. That was recommended to him in the past, yes.

On redirect examination by Mr. Ramos' counsel, this exchange followed:

Q. [Mr. Ramos' counsel] Could you have treated him for the jaw injury without treating him for the periodontal disease?

A. No.

Q. And when you say both problems, by replacing the dentures will cure both problems, you mean it would also help with the joint problem in allowing him to open his mouth?

A. Yes. My determination was that, because he had the—such amount of loose teeth in his mouth, that when the denture was made it gave him a more stable bite structure. That was going to take stress off this area where he had damage in the joint area on the right upper side. And my hope was, in the process of taking care of the teeth—which had to be replaced, anyway—that would give more joint stability, and thereby take stress off the mechanism where he had the injury.

[¶ 12] Mr. Ramos testified that, because of Dr. Sybrant's dental treatment, he feels pretty good and can eat. Mrs. Ramos testified that, after Dr. Sybrant's dental work, her husband's face and jaw didn't hurt as much, his headaches were less, he can eat most any food except jerky, and he has no problem opening his mouth and chewing.

[¶ 13] After the Ramoses testified, the Division moved for a directed verdict, arguing Mr. Ramos had failed to prove that the work accident materially aggravated the preexisting advanced periodontal disease. In response to that motion, Mr. Ramos' counsel conceded the existence of the preexisting disease but asserted that it was not the cause of his inability to open and close his mouth and if he had not had his jaw stabilized with Dr. Sybrant's dental treatment he would not have been able to open and close his mouth. In conclusion, Mr. Ramos' counsel stated a material aggravation existed and it was "a combination of both the periodontal disease and the accident which would create the TMJ or the TMD in this case."

[¶ 14] The hearing examiner denied the Division's motion for directed verdict; the Division did not present witnesses; the hearing examiner declared the evidence closed and asked for any additional closing statements. Mr. Ramos' counsel declined additional remarks; the Division's counsel reiterated its position, adding that Dr. Sybrant testified it would be speculating to say there was a material aggravation. The Division's counsel concluded, saying there was no question Mr. Ramos had a jaw problem where he could not open his mouth, that was different than removal of his teeth and periodontal disease, and the Division was not obligated to

pay for the dental work that had always been needed.

[¶ 15] The hearing examiner took the matter under advisement and closed the hearing. On January 5, 2005, the hearing examiner issued its order denying payment of Dr. Sybrant's dental bills. Of the order's nine findings-of-fact paragraphs, paragraphs eight and nine are the focus of Mr. Ramos' appeal. They read:

8. Dr. Sybrant testified APD [advanced periodontal disease] affects the entire mouth. Dr. Sybrant also testified he believed Ramos' continued mouth pain was more associated with the APD than with the work injury. Dr. Sybrant testified Ramos had needed the complete teeth extraction for several years prior to the August 26, 2003 injury. Finally, Dr. Sybrant testified he would be speculating to conclude the August 26, 2003 work-related injury caused the need for Ramos to finally have his teeth removed and dentures fitted.

9. While this Office is sympathetic to Ramos' situation, this Office cannot find Ramos has proven, by a preponderance of the evidence, his August 26, 2003 work injured [sic] caused the need for his teeth extractions and denture fabrication. This Office finds Ramos' need for the extractions and dentures was a preexisting condition which was diagnosed more than a decade before the work injury. Ramos' own dentist admitted the APD was not caused by the work injury and to even associate Ramos' mouth pain with the accident would be mere speculation. Thus, this Office must find the Division's June 8, 2004 Final Determinations denying coverage for the extractions and dentures must be upheld.

Of the order's seven conclusions-of-law paragraphs, paragraph seven, which is identical to paragraph nine of the findings of fact, is the focus of Mr. Ramos' appeal.

## STANDARD OF REVIEW

[¶ 16] The principles of this Court's standard of review of a hearing examiner's order in a contested case are well-known:

1. The scope of our view is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2005).

2. We review the order as if it came directly to us from the hearing examiner, giving no deference to the district court's decision on the petition for review; we review the hearing examiner's conclusions of law de novo. *State of Wyoming ex rel. Wyoming Workers' Safety and Comp. Div. v. Slaymaker*, 2007 WY 65, ¶¶ 9, 11, 156 P.3d 977, 980–81 (Wyo.2007).

3. Where the record is clear that only the party with the burden of proof submitted evidence in the contested case hearing and that party did not ultimately prevail, as in Mr. Ramos' case, the arbitrary or capricious standard governs the judicial review of the hearing examiner's order. *Newman v. State of Wyoming ex rel. Wyoming Workers' Safety and Comp. Div.*, 2002 WY 91, ¶ 22, 49 P.3d 163, 171 (Wyo.2002).

4. Applying the arbitrary or capricious standard, we review the entire record to determine whether the hearing examiner reasonably could have made his findings and order based upon all the evidence before him; a non-exhaustive list of examples of agency decisions reflecting arbitrary or capricious action includes an agency's internally inconsistent findings of fact and conclusions of law, entering incomplete findings of fact, or failing to provide findings of fact or conclusions of law. *Newman*, ¶¶ 19–23, 49 P.3d at 170–72.

## DISCUSSION

[¶ 17] The principles governing a claimant's burden of proof are well known:

In order to be eligible to receive worker's compensation benefits, a claimant must have sustained an "injury" as defined by Wyo. Stat. Ann. § 27–14–102(a)(xi) (LexisNexis 2001). " 'Injury' means any harmful change in the human organism other than normal aging ... arising out of and in the course of employment while at work...." To demonstrate that an injury arose out of the course of employment, the claimant must establish a causal connection between the work-related incident and the injury. *Hanks v. City of Casper*, 2001 WY 4, ¶ 6, 16 P.3d 710, 711 (Wyo.2001). The claimant bears the burden of proving this causal connection by a preponderance of the evidence. *Clark v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 2001 WY 132, ¶ 19, 36 P.3d 1145, 1150 (Wyo.2001). "A 'preponderance of the evidence' is defined as 'proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence.' " *Matter of Worker's Compensation Claim of Thornberg*, 913 P.2d 863, 866 (Wyo.1996) (quoting *Scherling v. Kilgore*, 599 P.2d 1352, 1359 (Wyo. 1979)).

*Anastos v. General Chemical Soda Ash*, 2005 WY 122, ¶ 20, 120 P.3d 658, 665–66 (Wyo. 2005).

"Injury," as the term is defined in Wyo. Stat. Ann. § 27–14–102(a)(xi) (LexisNexis 2003) of the Wyoming Workers' Compensation Act, does not include any injury or condition preexisting at the time employment begins with the employer against whom a claim is made. However, "in Wyoming an employer takes the employee as he finds him." *Lindbloom v. Teton International*, 684 P.2d 1388, 1389 (Wyo.1984). If an employee suffers from a preexisting condition, that employee may still recover if his employment substantially or materially aggravates that condition. *Id.* In *Lindbloom*, we cited with approval the widely accepted treatise, Larson's Workmen's Compensation Law, for the proposition that:

"Preexisting disease or infirmity of the employee does not disqualify a claim under the 'arising out of employment' requirement if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought."

1 Larson's Workmen's Compensation Law, § 12.20, p. 273–276. Larson goes on to say:

"Since the rule of law stated at the beginning of this section is so widely accepted, in practice most of the problems in this area are medical rather than

legal. * * * * It will be found then that denials of compensation in this category are almost entirely the result of holdings that the evidence did not support a finding that the employment contributed to the final result. Whether the employment aggravated, accelerated, or combined with the internal weakness or disease to produce the disability is a question of fact, not law, and a finding of fact on this point ... based on any medical testimony ... will not be disturbed on appeal."

*Id.,* § 12.20, p. 313–16.

*Boyce v. State ex rel. Wyoming Workers' Safety & Comp. Div.,* 2005 WY 9, ¶ 10, 105 P.3d 451, 454–55 (Wyo.2005).

▮▮▮▮ [¶ 18] Expert opinion testimony ordinarily will be required to establish the link between the employee's work activity or injury and the preexisting disease or condition; the expert need not state with specificity that the work activities or injury materially or substantially aggravated, accelerated, or combined with the preexisting disease or condition to necessitate the medical treatment for which compensation is sought; and the expert need not apportion between the work activity or injury and the preexisting disease or condition; the relative contribution of the work activity or injury and the preexisting disease or condition is not weighed. *Boyce,* ¶¶ 11, 16, 105 P.3d at 455, 456.

[¶ 19] Mr. Ramos does not challenge the findings of fact that he had long-standing periodontal disease and had elected years before his work-related injury not to have his teeth extracted and replaced with dentures. Rather, he does challenge those findings of fact in paragraphs 8 and 9 of the hearing examiner's decision which state:

— Dr. Sybrant testified he believed Mr. Ramos' continued mouth pain was more associated with the APD than with the work injury;

— Dr. Sybrant testified he would be speculating to conclude the August 26, 2003, work-related injury caused the need for Mr. Ramos to finally have his teeth removed and dentures fitted;

— Mr. Ramos' own dentist admitted that to even associate Mr. Ramos' mouth pain with the accident would be mere speculation.

[¶ 20] Moreover, Mr. Ramos challenges the hearing examiner's findings of fact for what has been omitted from them when one reviews the whole record. In this regard, he points to the following undisputed evidence:

— before the work injury, even with his advanced periodontal disease, his jaw structure was normal, he had no problems being able to open his mouth, he had no difficulty eating steak or jerky, he had no problem talking, and he rarely had headaches;

— as a result of the work injury and before Dr. Sybrant evaluated his mouth and jaw, he could not open his mouth and jaw, he felt severe pain in the right facial and jaw area, and he could eat only soft "liquidy" food;

— after Dr. Sybrant's dental treatment, he feels pretty good and he can eat solid foods again with the exception of jerky, his face and jaw do not hurt as much, he has fewer headaches, and he has no problem opening his mouth and jaw and chewing;

— the only point on which Dr. Sybrant testified he would be speculating was, in answer to the Division counsel's question, it would be speculating to say that the work injury caused "more of this problem" which was referring to the advanced periodontal disease;

— Dr. Sybrant's notes, records, and testimony established that while Mr. Ramos' advanced periodontal disease was at least a contributing factor in the amount of Mr. Ramos' discomfort and pain, his pain symptoms were somewhat limited to the right-hand side of his face where he sustained some damage from the work injury; Dr. Sybrant determined that Mr. Ramos had advanced periodontal disease and also temporomandibular dysfunction (TMD); Dr. Sybrant explained to Mr. Ramos how TMD is treated; to treat TMD, a stable introral environment is required and Mr. Ramos did not have that because of his advanced periodontal disease; treatment for TMD entails careful determination of

the proper bite relationship; to correct Mr. Ramos' dental problems and stabilize his TMD symptoms, Dr. Sybrant would extract Mr. Ramos' teeth, determine the best bite for correction of his TMD symptoms and incorporate that into the dentures; Dr. Sybrant's hope was to correct both the dental problems and the TMD simultaneously to stabilize the jaw and give more support for the jaw joint mechanism where he was getting a lot of his pain; Dr. Sybrant could not have treated Mr. Ramos' jaw injury without treating him for the periodontal disease; replacing Mr. Ramos' teeth with dentures would treat the disease and also help with the jaw joint problem in allowing him to open his mouth; the dentures gave Mr. Ramos a more stable bite structure which took stress off the upper right side jaw joint area where he had damage; Dr. Sybrant's hope was that taking care of the teeth which had to be replaced anyway would give more joint stability and, thereby, take stress off the mechanism where the injury was located.

[¶ 21] Countering Mr. Ramos' contentions, the Division asserts that substantial evidence supports the hearing examiner's decision that Mr. Ramos' long-standing preexisting periodontal disease, not the work-related injury, was the reason for Dr. Sybrant's dental treatment. In particular, the Division claims that, according to Dr. Sybrant, Mr. Ramos' periodontal disease caused his pain and it would be speculation to say his work-related injury caused more of the periodontal problem.

[¶ 22] Based upon a thorough review of the entire record and applying the applicable standard of review, we agree with Mr. Ramos' contentions and, accordingly, hold that the hearing examiner's decision was arbitrary and capricious and not in accordance with the law. With respect to paragraph 8 of the hearing examiner's findings of fact, Dr. Sybrant did not testify that Mr. Ramos' mouth pain was *more associated* with his periodontal disease than with his work-related injury. Dr. Sybrant did testify that Mr. Ramos had pain all the time in the upper right side teeth, his right face was tender

under the eye, he had right side headaches, a lot of his pain was due to the periodontal disease infection, his symptoms were somewhat limited to the right side of his face where he had had some damage from the work-related accident, the periodontal disease was at least a contributing factor in his discomfort, and the substantial work-related injury of fractured facial bones is connected very closely to the periodontal disease. In Dr. Sybrant's testimony, we do not see an opinion that the pain was more associated with the periodontal disease than the work-related injury. It is clear the pain was associated with both.

[¶ 23] Again with respect to paragraph 8 of the hearing examiner's findings of fact, Dr. Sybrant did not testify that he would be speculating to conclude that the work-related injury caused the need for Mr. Ramos to finally have his teeth removed and dentures fitted. Our careful reading of Dr. Sybrant's testimony, notes, and records reveals no such statement. The only instance in which Dr. Sybrant's testimony is associated with the term "speculation" appears in his affirmative answer to the Division counsel's question that it would be speculating to say that the work-related injury caused more of the periodontal problem.

[¶ 24] Importantly, Dr. Sybrant did connect the work-related injury to the dental treatment when he testified that Mr. Ramos had both periodontal disease and a TMD jaw problem and Dr. Sybrant would extract his teeth and fit him for dentures to correct the dental problems and stabilize his TMD symptoms. Dr. Sybrant testified that he could not have treated Mr. Ramos' jaw injury without treating his periodontal disease. He testified that extracting the teeth and fitting dentures would treat the disease and help the jaw joint problem allowing him to open his mouth; the dentures stabilized his bite structure which in turn took stress off the upper right side jaw joint area where the work-related injury damage was located.

[¶ 25] With respect to paragraph 9 of the hearing examiner's findings of fact, Dr. Sybrant did not admit "to even associate Ramos' mouth pain with the [work-related] accident would be mere speculation." Our

careful reading of Dr. Sybrant's testimony, notes, and records reveals no such statement. We note that paragraph 7 of the hearing examiner's conclusions of law also contains this erroneous attribution.

[¶ 26] Based upon our review of the entire record, Mr. Ramos proved by a preponderance of the evidence that his work-related injury substantially combined with his preexisting periodontal disease necessitated Dr. Sybrant's dental treatment. That combination is preponderantly evident from the Ramoses' and Dr. Sybrant's testimony. Our case law does not require Dr. Sybrant to apportion the combination between the work-related injury and the preexisting periodontal disease. We do not weigh the relative contribution of the work-related injury and the preexisting disease. *Boyce,* ¶ 11, 105 P.3d at 455.

[¶ 27] We reverse the hearing examiner's order and remand to the district court for further proceedings consistent with this opinion.