2009 WY 66

In The Matter of The Worker's Compensation Claim OF Clayton STRAUBE, Appellant (Petitioner),

v.

The STATE of Wyoming ex rel. WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Respondent).

No. S–08–0106.

Supreme Court of Wyoming.

May 20, 2009.

Representing Appellant: Kenneth DeCock of Plains Law Offices LLP, Gillette, Wyoming.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; James Michael Causey, Senior Assistant Attorney General; Kristi M. Radosevich, Senior Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Clayton Straube suffered an injury to his right knee while at work. The Workers' Compensation Division (Division) found the injury to be compensable and awarded benefits. Straube's knee never healed and approximately one year later he sought preauthorization from the Division for osteochondral autograph implant surgery. The Division determined that Straube's current knee problems solely related to a preexisting condition and denied further benefits. The Division's denial was upheld by the Medical Commission and, later, by the district court. We reverse.

## ISSUES

[¶ 2] Straube poses these issues:

A. Is the decision of the Medical Commission contrary to Wyoming law?

B. Is there substantial evidence to support the [Medical Commission's] conclusion?

C. Is the [Medical Commission's] decision arbitrary and capricious?

## FACTS

[¶ 3] On August 19, 2005, Straube injured his right knee while working as a pipe helper for TIC Industrial Co., Inc. in Gillette, Wyoming. Straube immediately reported to the emergency room at the Campbell County Memorial Hospital, where he was evaluated by Dr. Nathan S. Simpson, an orthopedic surgeon. Dr. Simpson ordered an MRI on Straube's right knee, which revealed an "os-

teochondral defect of the medial femoral condyle" and a loose fragment lodged between the anterior cruciate ligament (ACL) and the patellar tendon.

[¶ 4]   Straube was referred to Powder River Orthopedics & Spine, P.C. for additional orthopedic consultation.   He was evaluated by Dr. Gerald Baker and Dr. John P. Dunn. Both doctors concluded:

> [T]here does appear to be an osteochondral avulsion from the femoral condyle. From the MRI exam, however, it is impossible to tell whether or not that injury is acute or chronic.   There also appears to be a loose body within the interchondral notch, which probably represents the loose osteochondral fragment.

Dr. Dunn performed arthroscopic surgery on Straube's right knee on August 26, 2005, and removed the loose body.   In his Operative Report, Dr. Dunn noted:

> Patient was noted to have a large OCD lesion of the medial femoral condyle.   The remainder of the cartilage was pristine, and the meniscal cartilage was circumferentially stable to probing and pristine in appearance.   The notch was inspected. The loose fragment of the OCD lesion was noted to be present.   This was grasped with a pituitary and removed through a slightly enlarged anteromedial portal. Next, a lateral compartment was inspected and found to be pristine with regards to the articular cartilage and the meniscus, which was stable to circumferential probing.   Next, an arthroscopic shaver was introduced.   The base of the OCD lesion was noted to be covered in some fibrous material, which leads me to believe this was a preexisting OCD lesion that merely was knocked loose when the patient kneeled on it.   The base of the OCD lesion was debrided back to bare bone with a curette.

[¶ 5]   Straube received worker's compensation benefits for the injury and the surgery performed by Dr. Dunn. In a "Final Deter-mination Opening Case" issued on October 11, 2005, the Division informed Straube:

> Available medical evidence indicates that you suffered from a pre-existing condition affecting your right knee, but experienced an acute aggravation (loose body) as a result of the August 19, 2005, incident. Coverage will be provided for the acute aggravation only.

[¶ 6]   After the surgery, Straube was provided a course of physical therapy.   In late October, Straube moved back to his hometown of Spokane, Washington, where he sought medical treatment with Dr. Thomas L. Halvorson, an orthopedic surgeon with Rockwood Clinic Orthopedics and Sports Medicine.   Following Straube's initial visit with Dr. Halvorson on December 1, 2005, Dr. Halvorson noted:

> PLAN: At this point, we are going to make an attempt to get back to work.   I am a little bit doubtful that he will tolerate it; it is a fairly large lesion.   He brought his pictures with him today.   I suspect we are going to need to consider some sort of a Genzyme procedure to try to put some cartilage back in here.   We will go ahead and release him to work today, though, and see how he does.   I will plan on re-checking him once he has been back to work a little bit and see how he is tolerating it.

Straube's knee never completely recovered, and he was unable to return to work.   Eventually, Dr. Halvorson recommended that Straube undergo osteochondral autograph implant surgery (also referred to as the "Genzyme procedure").[1]

[¶ 7]   Dr. Halvorson submitted a request for preauthorization of the proposed surgical procedure to the Division.   After receiving the request, the Division sought independent medical evaluations from Dr. Meade Davis, III, and Dr. John A. Whipp, both board certified orthopedic surgeons.   The two doctors did not personally examine Straube and, instead, only conducted record reviews.   Dr. Davis replied to the Division as follows:[2]

---

1.   Under this procedure, a small amount of cartilage is taken from the patient's knee.   This sample is sent to a lab, where it is cultured and grown into a larger sample, which is later implanted into the patient's knee.

2.   We have chosen not to correct all of the obvious punctuation and grammatical errors.

I have reviewed the medical records which you forwarded to me on Clay Straube[.] Mr Straube was injured on August 19, 2005, his injury consisted of squatting down and developing acute pain in the right knee. He was seen immediately and evaluated, and then apparently a short period of time had an MRI which revealed a loose fragment in his knee, he underwent surgery on his right knee to remove the loose body and underwent a Microfracture technique[.] The base of the defect where the osteochondral fragment came from was covered in fibrous material which lead Dr Dunn to believe there was a pre-existing osteochondritis dissecans lesion that was loosened by the process of squatting or kneeling. The patient has continued to have symptoms, and is now being considered for further surgical procedure.

After some thought, I feel that the new requested procedure including a Genzyme procedure is not the responsibility of the Wyoming Worker's Safety and Compensation Division. I believe this was a pre-existing condition which was temporarily aggravated by the simple process of bending the knee[.] I believe the first surgery was appropriately covered by Worker's Compensation, however I feel that any mild activity could of caused the fragment to become loosened, and this could of occurred at home as well as at work with no particular trauma[.] Therefore I feel that this follow up surgery is a result of a pre-existing condition and not of the acute episode that occurred at work[.]

Similarly, Dr. Whipp replied:

We have, at your request, evaluated Mr. Straube's records[.] It is our determination that the initial surgery—the arthroscopic procedure—should be paid for without question[.] It is also our opinion, and we will say that this certainly could be questioned, assuming that someone feels this patient is a candidate for a Genzyme procedure, that that should not be paid for by the Division[.]

Our rationale for this is very simple. It is an apportionment item based upon the following facts[:] (1) Even though this patient was working when he sustained his injury, his injury was not of a nature that we believe actually caused an osteochondral fracture. (2) It is our opinion that this was, if you will, a genetic predisposition that this patient had and that he probably already had an osteochondritis dissecans[.] This determination by us, at least, is based upon the fact that (a) this came from an area where frequently dissecans occur, (b) he was in the right age group for this, (c) the trauma was not sufficient enough, in our opinion, to make this a fresh fracture, and (d) the operating physician thought that this was not an acute injury based upon the fibrous changes that he found at the base of the defect and he states this in the operative record.

Again, one certainly must consider the rule that, if someone is working and they get injured, it is Workers' Compensation's responsibility to care for that injury[.] We think the initial arthroscopic procedure did so[.] Whether or not the Division needs to be responsible for what we would determine to be a very expensive and possibly still somewhat experimental treatment is a different matter, in our opinion. We believe that there should be an apportionment rule in a case like this which we feel is fairly clearly not related to trauma, but to a congenital problem. The fact that the initial surgery was paid for, and should have been paid for, by the Division, does not obligate the Division to be responsible for the entire problem.

[¶ 8] Based on the opinions of Dr. Davis and Dr. Whipp, the Division issued a final determination on September 25, 2006, denying Dr. Halvorson's request for surgical preauthorization. The Division also issued a "Final Determination Regarding Pre-existing Condition" on September 28, 2006, which stated in pertinent part:

Based upon the recent review of your surgical pre-authorization request and associated documentation, the Division has determined that your current condition and related treatment is not compensable.

Available medical evidence indicates that the injury you sustained while in the course of employment with TIC was an

acute aggravation of a pre-existing condition. (See enclosed Final Determination dated October 11, 2005[.] ) The treatment for the temporary aggravation has been appropriately compensated by the Division; and medical evidence clearly indicates that any further medical intervention after December 1, 2005, is due solely to your pre-existing condition and in no way related to the August 19, 2005, incident. (Wyoming Statute 27–14–102(xi) & 27–14–102(xii)[.] )

[¶ 9] Straube objected to the Division's decisions, and his case was referred to the Medical Commission for an administrative hearing. While the hearing was pending, Straube moved back to Gillette and, once again, sought treatment with Dr. Dunn. In his medical records dated November 10, 2006, Dr. Dunn noted that Straube continues to have pain and that he is

> being evaluated by another orthopedic surgeon for Carticel autologous chondrocyte transplant. We discussed this procedure with the patient. I believe he is a good candidate for this. Unfortunately, it is not a procedure that I perform here in Gillette, Wyoming. The question has risen as to whether this is a preexisting condition or not. I believe that the OCD lesion may have been preexisting, but it is almost certainly significantly aggravated and exacerbated by his work injury there. Patient is going to pursue the Carticel transplantation, and I am going to see him back on an as needed basis.

On July 16, 2007, Dr. Dunn provided a letter to Straube's counsel, which stated in relevant part:

> It is my opinion, based on surgical findings, that the OCD lesion likely did, indeed, predate his Workers [sic] Compensation injury. However, the work related injury did result in the detachment of the OCD lesion, requiring the initial surgery. Unfortunately, the patient has had continued pain and problems and has an articular cartilage defect in the knee, which could be potentially aided by the proposed Genzyme procedure.

> As to your question, "Had the detachment not occurred, would Mr. Straub [sic] require this procedure?" the answer is no.

[¶ 10] At the contested case hearing held on August 8, 2007, the Medical Commission hearing panel was presented with the medical records, the letters authored by Dr. Dunn, Dr. Davis and Dr. Whipp, and Straube's testimony. Straube indicated that he made an attempt to return to light-duty work after his initial surgery but was very limited in what he could do. Straube testified his knee has not significantly improved since the surgery; he continues to experience constant pain and that his physical activities, including walking, are severely limited. Straube also testified that he never had any physical problems with his knee before the August 19 work injury.

[¶ 11] By order dated September 19, 2007, the Medical Commission upheld the Division's denial of benefits. In its Findings of Fact, the Medical Commission stated:

> 9. . . . This Panel disagrees with Dr. Dunn's opinion, and finds that the respective opinions of Drs. Davis and Whipp are more persuasive. Clearly, Mr. Straube had a preexisting condition, which we find to be significant. The osteochondral defect has been variously described as very large and substantial, and Dr. Dunn identified early on in his initial surgical procedure that the defect was likely preexisting. We also note that the mechanism of the work injury was relatively minor with the Employee/Claimant simply kneeling and the loose body created by the osteochondral defect having broken free at that point in time.

> This Panel finds that the preexisting osteochondral defect is the primary reason for the Employee/Claimant's present need for the surgical repair to his knee, and Mr. Straube would have certainly required surgical intervention at some time, due to the significant nature of the defect. Certainly such a kneeling incident could have occurred virtually anywhere, and there is little connection with the nature of the injury and the overall duties of his job, where he had only been employed for three days.

10 .... the Division met its obligation to Mr. Straube for the work injury by providing him with a contemporaneous surgery that removed the loose body fragment that was occasioned by the incident at work. Such an approach was medically reasonable at the time. Unfortunately, Mr. Straube continues to have significant issues with his knee, but this Panel finds that those complaints are entirely related to the preexisting condition and not the creation of the loose body, which was caused by the work injury. Mr. Straube, regardless of the existence of the work injury, was clearly in a situation where he would at some point require surgical intervention to his knee because of the preexisting osteochondral defect.

The Medical Commission concluded:

7. .... Although apportionment could be easily accomplished in this case due to the discrete nature of the work injury and the preexisting condition, such an approach is not permitted under the present regulatory and statutory scheme. This Panel therefore finds that the need for a subsequent surgery is not directly and causally related to the work injury, but rather is caused solely by the significant preexisting osteochondral defect, which preceded Mr. Straube's work injury.

... Mr. Straube's medical situation and the need for medical care and treatment can easily be separated out into that which was caused by the workplace injury, and that which was not, and was primarily due to his preexisting condition. Mr. Straube was initially surgically treated by Dr. Dunn, and the removal of the loose body by Dr. Dunn was necessitated by the work injury. The need for subsequent surgery, however, can be solely attributed to the preexisting condition of the osteochondral defect. Drs. Davis and Whipp both opined that the need for the subsequent surgery was not related to the original work injury.

* * * *

11. .... This Panel finds and concludes that the Workers' Safety and Compensation Division has met its obligation to Mr. Straube in providing medical care and treatment and the initial surgical procedure for the specific work-related injury. The loose body became detached while he was working and the Division paid for the medical care to remove that loose body. Mr. Straube clearly needs additional care and treatment for the osteochondral defect. Additional care and treatment, however, is primarily due to the significant preexisting condition that predated the work injury and not because he happened to dislodge the loose body while he was at work. This Panel finds that the Employee/Claimant has not met his burden in establishing that there is a causal connection between his current condition and the work injury of August 19, 2005.

[¶ 12] On review, the district court affirmed the denial of benefits. This appeal followed.

## STANDARD OF REVIEW

[¶ 13] On appeal from a district court's review of an administrative agency's decision, we afford no deference to the district court's decision. Rather, we review the case as if it came directly from the agency. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo.2008); *McIntosh v. State ex rel.* Wyoming Medical Comm'n, 2007 WY 108, ¶ 8, 162 P.3d 483, 487 (Wyo. 2007). As in all administrative proceedings, the scope of our review is governed by the factors specified in Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2007), which provides in pertinent part:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

* * * *

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 14] We discussed in detail the proper application of these standards in *Dale*, ¶¶ 20–26, 188 P.3d at 560–62. In short, we defer to an agency's findings of fact if supported by substantial evidence. *Id.*, ¶ 22, 188 P.3d at 561. We will not substitute our judgment for that of the agency if the agency's decision is reasonable under the circumstances. *Id.* We review an agency's finding that the burdened party failed to prove all the elements of his claim, as in this case, to determine "whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole." *Id.; see also Langberg v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2009 WY 39, ¶ 10, 203 P.3d 1098, 1101 (Wyo.2009); *Horn–Dalton v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2009 WY 14, ¶ 7, 200 P.3d 810, 813 (Wyo.2009). As always, we review an agency's conclusions of law de novo. *Dale*, ¶ 26, 188 P.3d at 561.

## DISCUSSION

[¶ 15] The principles governing a claimant's burden of proof are well established:

In order to be eligible to receive worker's compensation benefits, a claimant must have sustained an "injury" as defined by Wyo. Stat. Ann. § 27–14–102(a)(xi) (LexisNexis 2001). " 'Injury' " means any harmful change in the human organism other than normal aging . . . arising out of and in the course of employment while at work. . . ." To demonstrate that an injury arose out of the course of employment, the claimant must establish a causal connection between the work-related incident and the injury. *Hanks v. City of Casper*, 2001 WY 4, ¶ 6, 16 P.3d 710, 711 (Wyo.2001). The claimant bears the burden of proving this causal connection by a preponderance of the evidence. *Clark v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 2001 WY 132, ¶ 19, 36 P.3d 1145, 1150 (Wyo.2001). "A 'preponderance of the evidence' is defined as 'proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence.' " *Matter of Worker's Compensation Claim of Thornberg*, 913 P.2d 863, 866 (Wyo.1996) (quoting *Scherling v. Kilgore*, 599 P.2d 1352, 1359 (Wyo. 1979)).

*Anastos v. General Chemical Soda Ash*, 2005 WY 122, ¶ 20, 120 P.3d 658, 665–66 (Wyo. 2005).

"Injury," as the term is defined in Wyo. Stat. Ann. § 27–14–102(a)(xi) (LexisNexis 2003) of the Wyoming Workers' Compensation Act, does not include any injury or condition preexisting at the time employment begins with the employer against whom a claim is made. However, "in Wyoming an employer takes the employee as he finds him." *Lindbloom v. Teton International*, 684 P.2d 1388, 1389 (Wyo.1984). If an employee suffers from a preexisting condition, that employee may still recover if his employment substantially or materially aggravates that condition. *Id.* In *Lindbloom*, we cited with approval the widely accepted treatise, Larson's Workmen's Compensation Law, for the proposition that:

Preexisting disease or infirmity of the employee does not disqualify a claim under the "arising out of employment" requirement if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought.

1 Larson's Workmen's Compensation Law, § 12.20, p. 273–276. Larson goes on to say:

Since the rule of law stated at the beginning of this section is so widely

accepted, in practice most of the problems in this area are medical rather than legal. * * * * It will be found, then, that denials of compensation in this category are almost entirely the result of holdings that the evidence did not support a finding that the employment contributed to the final result. Whether the employment aggravated, accelerated, or combined with the internal weakness or disease to produce the disability is a question of fact, not law, and a finding of fact on this point * * * * based on any medical testimony * * * * will not be disturbed on appeal.

*Id.*, § 12.20, p. 313–16.

*Boyce v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2005 WY 9, ¶ 10, 105 P.3d 451, 454–55 (Wyo.2005).

Expert opinion testimony ordinarily will be required to establish the link between the employee's work activity or injury and the preexisting disease or condition; the expert need not state with specificity that the work activities or injury materially or substantially aggravated, accelerated, or combined with the preexisting disease or condition to necessitate the medical treatment for which compensation is sought; and the expert need not apportion between the work activity or injury and the preexisting disease or condition; the relative contribution of the work activity or injury and the preexisting disease or condition is not weighed.

*Ramos v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2007 WY 85, ¶ 18, 158 P.3d 670, 677 (Wyo.2007) (citing *Boyce*, ¶¶ 11, 16, 105 P.3d at 455–56).

[¶ 16] With these principles in mind, we now turn to Straube's complaints. We find it expedient to identify the focus of our analysis. It is undisputed that Straube suffers from a preexisting condition. It is also undisputed that Straube suffered a compensable material aggravation of this preexisting condition. Straube's first surgery on August 26, 2005, was covered as being directly necessitated by the work injury. The question before us is therefore whether the need for the proposed second surgery is also causally related to Straube's work injury.

[¶ 17] In support of its decision to deny benefits, the Medical Commission relied on the reports from Dr. Davis and Dr. Whipp. The opinions of these doctors are not based so much on medical information as their individual thoughts on the state of the law.[3] Dr. Davis stated that he thought about the situation and, since the initial injury could have occurred at anytime, the consequences of the surgery should not be the responsibility of the Division. The injury did not, of course, happen at just anytime, it happened while Straube was on the job. As already noted, an employer takes an employee as he finds him. *Lindbloom*, 684 P.2d at 1389. The Division recognized this rule when it initially granted benefits for a material aggravation. Because benefits were granted for the consequences of the injury, anything that is a direct continuing consequence is also covered. Dr. Whipp discussed apportionment. So did the Medical Commission. The Medical Commission's ultimate conclusion was, since apportionment under these circumstances is not legally allowed, then no benefits should be granted.

[¶ 18] Needless to say, it is not for doctors or the Medical Commission to question public policy, let alone thwart it. The inability to apportion the medical consequences of a work injury between the immediate injury and a preexisting condition is not a reason to deny benefits. Benefits are awarded if the medical consequences are causally related to the work injury. The evidence in this case supports such causal connection. Straube's knee never fully recovered after the work injury, as evidenced by the continued weakness in the knee and Straube's continued pain.[4] More importantly, the only medical evidence directly on point comes from Dr. Dunn, who unequivocally stated the currently recommended surgery would not be necessary had it not been for the work injury. We must, therefore, conclude that the decision of the Medical Commission is against the overwhelming weight of the evidence.

3. We note that the doctors' responsive reports fail to identify the medical records they reviewed.

4. Straube's continuing symptoms are even recognized by Dr. Davis and the Medical Commission.

[¶ 19]   The decision of the Medical Commission is reversed.   This case is remanded to the district court to reverse the order denying benefits and for entry of an order granting benefits.

BURKE, J., files a dissenting opinion, in which VOIGT, C.J., joins.

BURKE, Justice, dissenting, with whom VOIGT, Chief Justice, joins.

[¶ 20]   I respectfully dissent.

[¶ 21]   Mr. Straube injured his right knee while at work.   During surgery, paid for by workers' compensation, a loose fragment of bone or cartilage was removed from the knee joint.   The surgeon's notes indicated that Mr. Straube had a "preexisting ... lesion that merely was knocked loose when the patient kneeled on it."   Later, Mr. Straube's doctor recommended a second surgical procedure to repair cartilage in the knee.   The basic issue before the Medical Commission was whether the second surgery was necessary because of the pre-existing condition, or whether the work-related injury had caused or materially aggravated the pre-existing condition.   As the Medical Commission correctly set forth in its decision, pre-existing conditions are generally not compensable. Workers' compensation benefits are proper, however, if the "work effort contributed to a material degree to the precipitation, aggravation or acceleration of the existing condition of the employee." *Haynes v. State ex rel. Wyoming Workers' Comp. Div.*, 962 P.2d 876, 878 (Wyo.1998).

[¶ 22]   After a hearing, the Medical Commission found that the recommended surgery was attributable to the pre-existing condition, not the work-related injury.   "We defer to an agency's findings of fact if supported by substantial evidence upon the record as a whole." *Langberg v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2009 WY 39, ¶ 10, 203 P.3d 1098, 1101 (Wyo.2009), citing *Dale*, ¶ 22–26, 188 P.3d at 561–62.   The basic question before us on appeal, then, is whether there is substantial evidence in the record to support the Medical Commission's findings.   There is.

[¶ 23]   Reports from Drs. Davis and Whipp stated that the condition was pre-existing, and indicated that it was not caused or materially aggravated by the work-related injury.   The majority observes that these two doctors' opinions were based not "so much on medical information as their individual thoughts on the state of the law." Stripped to basics, however, Dr. Davis's report set forth his medical opinion that Mr. Straube's "follow up surgery is a result of a pre-existing condition and not of the acute episode that occurred at work."   Dr. Whipp's report related his medical opinion that Mr. Straube's work-related injury "was not of a nature that we believe actually caused" the underlying condition, which was "a genetic predisposition that this patient had and that he probably already had."   These opinions provided substantial evidence to support the Medical Commission's findings.

[¶ 24]   Contrary evidence was provided by Dr. Dunn. He agreed that Mr. Straube had a pre-existing condition, but opined that further treatment would not have been necessary except for the work-related injury.   The Medical Commission weighed the conflicting evidence, and made its position clear: "This Panel disagrees with Dr. Dunn's opinion, and finds that the respective opinions of Drs. Davis and Whipp are more persuasive."   On that basis, the Medical Commission found that Mr. Straube's second surgery was necessary because of his pre-existing condition, and not because of his work-related injury.

[¶ 25]   The majority seems to discount the opinions of Drs. Davis and Whipp because they reviewed Mr. Straube's medical records but did not examine the patient.   This is common enough in workers' compensation cases, and does not render the evidence inadmissible or incompetent.   It may affect the credibility or persuasiveness of the doctors' opinions, but it is up to the Medical Commission, not this Court, to determine the credibility of witnesses and the weight afforded to conflicting evidence.   "[W]e defer to the experience and expertise of the agency in its weighing of the evidence." *Southwest Wyoming Rehabilitation Center v. Employment Sec. Comm'n of Wyoming*, 781 P.2d 918, 921 (Wyo.1989).   Deference is particularly appro-

priate here, as the Medical Commission was established specifically as "a means for parties to have difficult medically contested issues such as these resolved by a panel of the medical commission, which is comprised of health care providers with the professional expertise to make an informed decision." *Snyder v. State ex rel. Wyoming Worker's Compensation Div.*, 957 P.2d 289, 294 n. 2 (Wyo.1998).

[¶ 26] I would defer to the Medical Commission's findings of fact, and affirm its decision.