2008 WY 100

In the Matter of the WORKER'S COM-
PENSATION CLAIM OF Daniel DECK-
ER, Appellant (Claimant),

v.

STATE of Wyoming, ex rel., WYOMING
MEDICAL COMMISSION and Wyo-
ming Workers' Safety and Compensa-
tion Division, Appellees (Respondents).

No. S–07–0051.

Supreme Court of Wyoming.

Aug. 27, 2008.

Representing Appellant: Bill G. Hibbler of Bill G. Hibbler, P.C., Cheyenne, Wyoming.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; Steven R. Czoschke, Senior Assistant Attorney General; Kristi M. Radosevich, Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, JJ., and YOUNG, D.J.

GOLDEN, Justice.

[¶1] This appeal is round two in Daniel Decker's odyssey to be awarded worker's compensation benefits. Mr. Decker made a claim for worker's compensation benefits for an allegedly work related aggravation of symptoms associated with thoracic outlet syndrome (TOS). The Workers' Compensation Division denied his claim. The case was referred to the Medical Commission for hearing. After a hearing before a medical hearing panel, the Medical Commission upheld the denial.

[¶ 2] In the first appeal, *Worker's Compensation Claim of Decker v. State ex rel. Wyoming Medical Comm'n*, 2005 WY 160, 124 P.3d 686 (Wyo.2005) (*Decker I* ), we vacated the Medical Commission's order because it failed to make findings that adequately explained the rationale for the Medical Commission's decision. On remand, without reopening the hearing, the Medical Commission entered a new, more detailed order. Although we find the Medical Commission followed proper procedures under the circumstances, we also find that its decision is not supported by substantial evidence. We therefore reverse the denial of benefits.

## ISSUES

[¶ 3] Mr. Decker presents two issues for our review:

I. Whether the Medical Commission's supplemental order is supported by substantial evidence or is arbitrary and capricious in holding that Mr. Decker's work did not aggravate his medical condition?

II. Whether the Medical Commission denied Mr. Decker due process by denying his attendance and additional argument at the deliberation?

## FACTS

[¶ 4] The basic facts were set forth in detail in *Decker I:*

Decker began working as a sheet metal worker approximately one year out of high school. He worked for Powder River Heating for six and a half years, and then in October 2000 he began working for Mountain Aire in Gillette, Wyoming. Decker's duties for Mountain Aire were similar to his duties with his former employer, except in his employment with Mountain Aire he did not have an assistant working with him and he worked more overtime. His duties included fabrication, assembly, and installation of ductwork. In the fabrication and assembly processes, Decker's work was performed primarily at waist level. During installation of the ductwork, 95% of Decker's work was overhead requiring him to work eight hours out of a ten-hour day with his hands over his head.

On August 27, 2001, Decker was pulling a piece of tin out from under a bench and felt his wrist pop. Shortly thereafter while snipping the corners of another piece of tin, Decker's other wrist popped and began to feel sore. From Decker's reported date of injury to the date of his hearing before the Medical Commission, Decker was examined and/or treated by at least nine physicians and one psychologist, including two independent medical examiners. We set forth below a fairly detailed account of the medical evidence presented to the Medical Commission. . . .

On August 27, 2001, the same day on which he experienced the onset of pain in his wrists, Decker sought medical care from Dr. Paul Johnson. Dr. Johnson noted his impression that Decker suffered from bilateral wrist tendinitis, prescribed a wrist splint for his right wrist along with physical therapy, and instructed him to avoid grasping and using his grip for extended periods of time. Dr. Johnson made an entry in his notes for that visit that he would see Decker again in one month and "if he is still having significant symptoms, and if it acts more neurologic, would then do an EMG study."

On August 28, 2001, Decker signed his worker's compensation injury report, describing his injury as tendinitis in both wrists. The Division received the report on August 31, 2001.

On September 17, 2001, Decker again saw Dr. Johnson. Dr. Johnson made the following note concerning that visit:

27–year–old male here for recheck of his bilateral hand pain. He has been going to physical therapy, notes that he is a little bit better, however, he has some areas that are a little more pronounced in discomfort. Describes pain radiating back to the elbow. Notes some thumb discomfort. He has pain that goes into the middle finger bilaterally. His left wrist feels worse than the right. He notes that on some days he will have very little pain and discomfort and then on other days he will have a significant

amount of paresthesia and pain to the wrist area and fingers. Notes that he is dropping objects. He has a hard time with grip strength. Notes occasional lateral elbow discomfort. Denies neck pain or shoulder pain.

Following the September 17, 2001, exam, Dr. Johnson noted his impression that Decker suffers from bilateral wrist pain, "suspicious for carpal tunnel syndrome." He referred him for an EMG study bilaterally and instructed him to "continue with work modification, decreased usage of his hands, ice, physical therapy modalities."

On October 11, 2001, Decker had a third appointment with Dr. Johnson. Dr. Johnson noted the following concerning Decker's condition:

> He has bilateral wrist and hand pain with paresthesias. States lately he has been getting more symptoms of paresthesias. Notes when he takes days off and doesn't work he does pretty well however on days that he begins working it doesn't take very long for him to begin having the paresthesias, pain and weakness. Denies elbow or shoulder pain. Notes discomfort in all aspects of his hands, pain with flexion/extension.

Dr. Johnson discussed with Decker the results of his EMG test which were normal. Dr. Johnson's overall impression of Decker's condition on that visit was "hand paresthesias and weakness." Following the October 11, 2001, visit, Dr. Johnson referred Decker to Dr. Mark Simonson for an evaluation of his paresthesias.

Decker saw Dr. Simonson on October 31, 2001. Dr. Simonson described Decker as presenting "an unusual case of bilateral hand parasthesias, migrating bilateral upper extremity pain, sense of discontrol, and an unusual exam." He went on to note:

> He could have some component of radial tunnel syndrome, though his electrodiagnostic study adequately evaluated this possibility and was normal.
>
> He may have some component of thoracic outlet syndrome, noting irritability here, with his forward shoulders and tightness throughout the shoulder gir-

dles. Perhaps he has some degree of underlying cervical stenosis.

\* \* \* \*

> I am recommending his physical therapist give some attention to the thoracic outlet including biomechanics and postural education.

On November 15, 2001, Decker returned to Dr. Simonson for a follow-up visit. Decker reported to Dr. Simonson that his overall pain on that date was "not near as bad and has improved a lot." Dr. Simonson also made the following note:

> Today, he tells me that he gets exhausted by midday. He tells me that it continually feels like his T-shirt is too tight and he is always pulling on it. He has a sense of fullness in his neck and feels like he is not getting enough blood to his head. He feels borderline dizzy at times.

\* \* \* \*

> This continues to appear as a thoracic outlet problem, at least in part. There may be both neurologic as well as vascular components to this. Regarding the latter and his complaints of a sense of fullness and poor circulation to his head and such, I recommend vascular consultation, with Dr. Schabauer.

On December 11, 2001, Decker saw Dr. Schabauer. According to Decker's testimony, Dr. Schabauer's initial examination and testing lasted about one and a half hours. Following that initial examination, Dr. Schabauer diagnosed Decker with thoracic outlet syndrome. His notes concerning his assessment provide:

> Thoracic outlet syndrome. Supportive through noninvasive testing just completed at the clinic, as well as physical examination. Have recommended that he continue with physical therapy, and over the next 6 months, if he does not see improvement, could then move onto other considerations. In the interim, he should also lose weight. This would also help him in symptom relief.... Interestingly, it seems with Mr. Decker that he has a component of nerve as well as venous and arterial impingement present.

In his deposition testimony in this case, Dr. Schabauer testified that wrist aching, along with whole arm aching, a degree of numbness and heaviness of the arm are symptoms associated with thoracic outlet syndrome. He also testified that the physiology of thoracic outlet syndrome is congenital and he could not say that Decker's work caused the condition. He testified further that in his opinion, "based upon a reasonable degree of medical probability and/or certainty," Decker's overhead work as a sheet metal worker aggravated his thoracic outlet syndrome.

Decker was next referred by Dr. Simonson to Dr. Stephen Annest, a vascular surgeon. On February 19, 2002, Decker saw Dr. Annest. Dr. Annest diagnosed Decker with brachial plexus impingements, noting:

His present complaints are consistent with brachial plexus impingements with pain in the shoulder, radiating into the arm and hand with numbness and tingling of the ulnar two fingers and thumb. He has a sensation of clumsiness. Overhead actions worsen his symptoms.

By letter dated March 29, 2002, Dr. Annest provided his opinion that Decker's complaints "are work related complaints which resulted from his work as a sheet metal worker for Mountain Air Heating Company."

Decker again saw Dr. Annest on May 7, 2002, still reporting neck, shoulder and arm pain. Dr. Annest noted that Decker "continues to have symptoms consistent with a diagnosis of brachial plexus entrapment bilaterally," and he referred Decker to Dr. Robert Wright at Denver Pain Management for an interscalene block. Dr. Wright performed the interscalene block on May 10, 2002, and noted following the procedure: "The patient tolerated the procedure well and experienced excellent relief of pain in his right upper extremity. Given the low volume injectate used, this result is consistent with and supports a diagnosis of thoracic outlet syndrome." Decker reported that the relief of his symptoms following the treatment was only short term.

On July 17, 2002, at the Division's direction, Decker saw Dr. Bruce Lockwood for an independent medical examination. Dr. Lockwood included the following comments in his notes after examining Decker:

I feel that in all likelihood his intermittent parascapular and cervical pain complaints are myogenic in origin. This plays a part in what would appear to be myogenic brachial plexus irritation at the thoracic outlet. . . . I do feel that his symptoms and with the lack of nonorganic dysfunction on exam in all likelihood are produced by myogenic thoracic outlet dysfunction.

* * * *

I feel that there are multiple factors that play a part into why he is having most likely a myogenic thoracic outlet syndrome. These include most importantly probably his posture, body mechanics and genetics and his overall systemic condition. Other factors or possible aggravators may have been utilization of the activator and activities both inside and outside of work which usually are [at] or above chest level and are repetitive in nature. I do not feel that a primary injury occurred at work, but do feel that it is reasonable and probable that work activities, as well as activities outside of work aggravated his overall condition, but did not cause his condition.

* * * *

I do not feel that his history nor his documentation indicates a work-related injury. The contention is that there was a work-related aggravation. While I feel that his work activities in all likelihood within a probability play a part in his myofascial dysfunction, there are multiple factors and more pressing factors outside of work that I have discussed above that are playing a part in his presentation. I also discussed with him my concerns that he feels that he was wrongfully terminated or laid off work. He became somewhat agitated in discussing this which indicates there may be actually a significant psychologic component or secondary gain issue play-

ing a part in his presentation. If this continues to persist, a psychologic evaluation could help clarify this.

On May 28, 2003, Decker saw another physician, Dr. Charles Brantigan, a vascular and thoracic surgeon. Dr. Brantigan noted the following after his physical examination of Decker:

My recommendation is that he see a rheumatologist. The history of joint pains is not compatible with thoracic outlet syndrome. I have also suggested that he needs to have a CT of the thoracic outlet using our protocol.

The problem that we face is that he has no health insurance at the present time. Workmen's Compensation is denying his claim. From my standpoint, it sounds like a repetitive motion injury of some type, and absent some other explanation, I am inclined to attribute that to his work.

On October 9, 2003, at the Division's direction, Decker saw Dr. Joel L. Cohen, a psychologist. Dr. Cohen concluded that Decker was not a good candidate for surgical intervention based in part on his following observations:

He is scheduled for a legal hearing in early 2004 and is hoping to find some resolve in his situation. His concerns are financial because he has had to pay most of the recent medical treatment and as a result has accrued a substantial debt, which [he] is struggling to manage. Given that, one has to consider the possibility (whether conscious or unconscious) of secondary gain issues.

At the time of our meeting, the patient was not reporting a substantive injury related emotional and psychological distress. He acknowledged a longstanding history of episodic depression. . . . He described himself as often internalizing emotional distress and I have no doubt that this is a factor that has contributed to the longstanding history of ill health. To the extent that we can assume his internalized emotional distress contributed to previous illness as well as a reported history of some colitis-like symptoms it is also clear that we can assume internalized distress is an active factor in his current symptom complaints.

The last physician Decker saw before his contested case hearing was Dr. Gerald Moress, a neurologist. At the Division's request, Decker saw Dr. Moress on January 16, 2004, for another independent medical examination. Dr. Moress stated that he did not "find any psychological implications" for Decker's problem. His notes also stated:

1. I am unable to diagnose thoracic outlet syndrome either related to occupational exposure or any other causation. His finding of decreased radial pulse with certain provocative measures is found so commonly in the normal population that the testing is unreliable. There is no gold standard for making the diagnosis of thoracic outlet syndrome. The condition is over diagnosed and unfortunately over treated. He has aching in both hands and elbows with a bizarre sensory finding of decreased perception to pinprick over both palms. This is clearly nonphysiologic. There is no evidence of any vascular compromise in the upper extremities. The motor examination is entirely normal. . . .

2. I agree with Dr. Lockwood that there was not any specific injury that occurred at work that caused his symptomology. He developed nonspecific soft tissue muscle ligamentous problems in the upper extremities related to his work. . . .

* * * *

6. It would be reasonable that his original diagnoses had been wrist tendonitis and it certainly would have improved when he had discontinued his work. There is no implication for TOS.

* * * *

9. Mr. Decker's current medical condition is nonspecific discomfort of the forearms and hands associated with a nonphysiologic sensory change. There would be no pre-existing condition related to his current complaints.

*Decker I,* ¶¶ 3–18, 124 P.3d at 689–92 (footnotes omitted). To the above facts, we must note that Mr. Decker underwent extensive physical therapy from August 28, 2001, to the end of December 2001. We also note that Dr. Johnson issued a work release to Mr. Decker on December 5, 2001. Despite the work release, Mr. Decker was fired from his position on December 11 or 12, 2001, because he was unable to return to his former regular schedule. His company reported that they let him go because they had no light duty work available.

[¶ 5] The original order from the medical hearing panel contained mainly conclusory findings. The current order more thoroughly reflects the evidence and why the medical hearing panel relied almost exclusively on the opinions of the doctors performing the independent medical examinations. The medical hearing panel denied Mr. Decker's claim in large part because it found Mr. Decker unbelievable. It found Mr. Decker's testimony to be "lacking in credibility," and therefore "largely disregarded" it. The hearing panel discounted almost entirely the opinions of the treating physicians supporting Mr. Decker's claim for benefits because it determined they relied upon "variable and contradicting histories given by Mr. Decker,":

> The Panel finds that the physicians who rendered favorable opinions regarding Mr. Decker were not in receipt of all, or even most, of the critical information and records regarding Mr. Decker. Such providers were provided with minimal records and inaccurate and greatly varying histories by Mr. Decker. A medical expert can only offer credible opinions if they are provided with an accurate history and background. The history provided by Mr. Decker was significantly at variance with the actual history from contemporaneous records, and documented facts.

In the end, the medical hearing panel determined that, "[g]iven Mr. Decker's credibility issues, opinions of doctors which rely on his credibility are not persuasive." Instead, it "generally agree[d] with the findings by Drs. Lockwood and Moress given their ability to conduct an extensive review of Mr. Decker's

treatment history and their ability to examine him."

[¶ 6] The medical hearing panel summed up its findings:

> The Panel finds and concludes that the medical evidence presented not only fails to relate Mr. Decker's symptomatology to his employment as a sheet metal worker, but even refutes a causal association, either directly or indirectly:
>
> (a) The initial symptoms of wrist pain are consistent with and likely were correctly diagnosed and successfully treated as bilateral wrist tendinitis.
>
> (b) Wrist tendinitis does not cause or lead to thoracic outlet syndrome.
>
> (c) Thoracic outlet like symptoms developed and reportedly worsened while he was off work or on light duty—not during his regular job duties. This is exactly the opposite of what would be expected, as opined by medical experts.
>
> (d) Other factors existing at the time periods involved can be incriminated in the development of these thoracic outlet symptoms including:
>
> (i) Intrinsic anatomical factors including a slumped posture with forward sloping shoulders, and long cervical transverse processes.
>
> (ii) Weight gain.
>
> (iii) Psychological issues including depression very likely contributed to multiple symptoms and exaggerated appreciation of symptoms.
>
> (iv) Other aggravating/precipitating factors including working overhead while home remodeling and hammering, driving, and overhead and other work at Sears.

## DISCUSSION

### *Violation of due process*

[¶ 7] Mr. Decker's second issue, by questioning the procedure followed by the Medical Commission hearing panel on remand, would prove dispositive of this appeal. Mr. Decker, in his appellate argument, directs our attention to two different facets of the actions of the hearing panel on remand that he claims violated his due process rights.

Mr. Decker's arguments raise questions of law, which we review de novo.

*Wyoming Public Meetings Act*

[¶ 8] First, Mr. Decker contends that the Medical Commission violated his rights to due process of law when the Medical Commission hearing panel assigned to adjudicate his case did not deliberate its decision in a public meeting. Mr. Decker claims this is a violation of the Public Meetings Act, Wyo. Stat. Ann. §§ 16–4–401 through 16–4–408, and, hence, the review panel's decision is void. The review panel responded to that contention in detail in its Findings of Fact and Conclusions of Law. The district court gave it short shrift in its order affirming the review panel's denial of benefits. Mr. Decker gave it short shrift in his brief in this appeal. However, if his argument is correct with respect to a violation of the Public Meetings Act, then the decision is void, and new proceedings must be ordered.

[¶ 9] For several reasons, we disagree with Mr. Decker's assertion that the hearing panel's order is void because it did not comply with Wyoming's Public Meetings Act (PMA). The PMA was enacted in 1973 and has been modified only slightly over the years. In the interests of clarity, the provisions of that act are set out below:

§ 16–4–401. Statement of purpose.

The agencies of Wyoming exist to conduct public business. *Certain deliberations and actions shall be taken openly* as provided in this act.

§ 16–4–402. Definitions.

(a) As used in this act:

(i) *"Action" means the transaction of official business of an agency including a collective decision of a governing body, a collective commitment or promise by a governing body to make a positive or negative decision, or an actual vote by a governing body upon a motion, proposal, resolution, regulation, rule, order or ordinance;*

(ii) *"Agency" means any authority, bureau, board, commission, committee, or subagency of the state, a county, a municipality or other political subdivision which is created by or pursuant to the Wyoming constitution, statute or ordinance, other than the state legislature and the judiciary;*

(iii) *"Meeting" means an assembly of at least a quorum of the governing body of an agency which has been called by proper authority of the agency for the purpose of discussion, deliberation, presentation of information or taking action regarding public business;*

(iv) "This act" means W.S. 16–4–401 through 16–4–408.

§ 16–4–403. Meetings to be open; participation by public; minutes.

(a) *All meetings of the governing body of an agency are public meetings,* open to the public at all times, except as otherwise provided. *No action of a governing body of an agency shall be taken except during a public meeting* following notice of the meeting in accordance with this act. *Action taken at a meeting not in conformity with this act is null and void and not merely voidable.*

(b) A member of the public is not required as a condition of attendance at any meeting to register his name, to supply information, to complete a questionnaire, or fulfill any other condition precedent to his attendance. A person seeking recognition at the meeting may be required to give his name and affiliation.

(c) Minutes of a meeting:

(i) Are required to be recorded but not published from meetings when no action is taken by the governing body;

(ii) Are not required to be recorded or published for day-to-day administrative activities of an agency.

§ 16–4–404. Types of meetings; notice; recess.

(a) In the absence of a statutory requirement, *the governing body of an agency shall provide by ordinance, resolution, bylaws or rule for holding regular meetings unless the agency's normal business does not require regular meetings in which case the agency shall provide notice of its next meeting to any person who requests notice.* A request for notice

may be made for all future meetings of an agency.

(b) ***Special meetings may be called by the presiding officer of a governing body*** by giving notice of the meeting to each member of the governing body and to each newspaper of general circulation, radio or television station requesting the notice. The notice shall specify the time and place of the special meeting and the business to be transacted. No other business shall be considered at a special meeting.

(c) ***The governing body of an agency may recess any regular, special, or recessed regular or special meeting to a place and at a time specified in an order of recess.*** A copy of the order of recess shall be conspicuously posted on or near the door of the place where the meeting or recessed meeting was held.

(d) ***The governing body of an agency may hold an emergency meeting on matters of serious immediate concern to take temporary action without notice.*** Reasonable effort shall be made to offer public notice. All action taken at an emergency meeting is of a temporary nature and in order to become permanent shall be reconsidered and acted upon at an open public meeting within forty-eight (48) hours.

(e) ***Day-to-day administrative activities of an agency shall not be subject to the notice requirements of this section.***

### § 16–4–405. Executive sessions.

(a) ***A governing body of an agency may hold executive sessions not open to the public:***

(i) With the attorney general, county attorney, district attorney, city attorney, sheriff, chief of police or their respective deputies, or other officers of the law, on matters posing a threat to the security of public or private property, or a threat to the public's right of access;

(ii) To consider the appointment, employment, right to practice or dismissal of a public officer, professional person or employee, or to hear complaints or charges brought against an employee, professional person or officer, unless the employee, professional person or officer requests a public hearing. The governing body may exclude from any public or private hearing during the examination of a witness, any or all other witnesses in the matter being investigated. Following the hearing or executive session, the governing body may deliberate on its decision in executive sessions;

(iii) On matters concerning litigation to which the governing body is a party or proposed litigation to which the governing body may be a party;

(iv) On matters of national security;

(v) When the agency is a licensing agency while preparing, administering or grading examinations;

(vi) When considering and acting upon the determination of the term, parole or release of an individual from a correctional or penal institution;

(vii) To consider the selection of a site or the purchase of real estate when the publicity regarding the consideration would cause a likelihood of an increase in price;

(viii) To consider acceptance of gifts, donations and bequests which the donor has requested in writing be kept confidential;

(ix) To consider or receive any information classified as confidential by law;

(x) To consider accepting or tendering offers concerning wages, salaries, benefits and terms of employment during all negotiations;

(xi) To consider suspensions, expulsions or other disciplinary action in connection with any student as provided by law.

(b) ***Minutes shall be maintained of any executive session.*** Except for those parts of minutes of an executive session reflecting a members' objection to the executive session as being in violation of this act, minutes and proceedings of executive sessions shall be confidential and produced only in response to a valid court order.

(c) Unless a different procedure or vote is otherwise specified by law, an executive session may be held only pursuant to a motion that is duly seconded and carried by majority vote of the members of the governing body in attendance when the motion is made.

§ 16–4–406. **Disruption of public meetings.**

If any public meeting is willfully disrupted by a person or group of persons so as to render the orderly conduct of the meeting unfeasible, and order cannot be restored by the removal of the person or persons who are willfully interrupting the meeting, the governing body of an agency may recess the meeting and reconvene at another location. Only matters appearing on the agenda may be acted upon in a meeting recessed to another location. A governing body of an agency shall establish procedures for readmitting an individual or individuals not responsible for disturbing the conduct of a meeting. Duly accredited members of the press or other news media except those who participated in a disturbance shall be allowed to attend any meeting permitted by this section.

§ 16–4–407. **Conflict of law.**

If the provisions of this act conflict with any other statute, the provisions of this act shall control.

§ 16–4–408. **Penalty.**

(a) Any member or members of an agency who knowingly and willfully takes an action in violation of or conspires to take an action in violation of this act shall be guilty of a misdemeanor. Any member of the governing body of an agency who attends or remains at a meeting where an action is taken knowing that the action is in violation of this act shall be guilty of a misdemeanor unless minutes were taken during the meeting and the parts thereof recording the member's objections are made public or at the next regular public meeting the member objects to the meeting where the violation occurred and asks that the objection be recorded in the minutes. Either misdemeanor violation under this subsection is punishable upon conviction by a fine of not more than seven hundred fifty dollars ($750.00).

(b) *If any action is prohibited both by this act and any provision of title 6, the provisions of this act shall not apply and the provisions of title 6 shall apply.*.

Wyo. Stat. Ann. §§ 16–4–401 through 16–4–408 (LexisNexis 2007) (emphasis added).

[¶ 10] Prior to 1986, disputed worker's compensation cases were adjudicated in the district courts. In 1986, the Wyoming Legislature changed that process to the use of independent hearing officers, with appeals available to both the district courts and the Supreme Court. 1986 Wyo. Sess. Laws (Special Session) ch. 3. This change was formalized in 1992, when the office of administrative hearings was created. 1992 Wyo. Sess. Laws ch. 30.

[¶ 11] In 1993, in recognition of an apparent need for a specialized, quasi-judicial hearing body to consider worker's compensation cases that required hearing officers with medical expertise, the Wyoming Legislature created the Medical Commission:

§ 27–14–616. **Medical commission; hearing panels; creation; membership; duties; rulemaking.**

(a) The medical commission is created to consist of eleven (11) health care providers appointed by the governor as follows:

(i) Seven (7) licensed physicians appointed from a list of not less than fourteen (14) nominees submitted by the Wyoming Medical Society;

(ii) Four (4) health care providers appointed from a list of not less than eight (8) nominees developed and submitted by appropriate health care provider groups selected by the director.

(b) One (1) member shall be elected by commission members as chairman and one (1) as vice-chairman. The division shall designate an employee to serve as executive secretary of the commission or contract with an individual to provide executive secretary services to the commission. The governor may appoint no more than eleven (11) additional health care providers as associate members of the commission whose function is limited to serving as members of individual medical hearing panels. Except for initial members, the terms of commission members and associate members shall be three (3) years. Three (3) members of the initial commission and three (3) initial associate members shall be appointed to a one (1) year term and four (4) initial commission mem-

bers and four (4) initial associate members shall be appointed to a two (2) year term. The duties of the commission shall be:

(i) To promulgate rules and regulations, with the approval of the director of the department, declaring particular medical, hospital or other health care procedures either acceptable or not necessary in the treatment of injuries or particular classes of injuries and therefore either compensable or not compensable under this act or expanding or limiting the compensability of such procedures under this act;

(ii) To promulgate rules and regulations, with the approval of the director of the department, establishing criteria for certification of temporary total disability by health care providers and setting forth the types of injuries for which particular health care providers may certify temporary total disability pursuant to W.S. 27–14–404(g);

(iii) To advise the division, upon request, on the usefulness of medical cost containment measures; and

(iv) To furnish three (3) members of the commission to serve as a medical hearing panel to hear cases referred for hearing. The division shall refer medically contested cases to the commission for hearing by a medical hearing panel. The decision to refer a contested case to the office of administrative hearings or a medical hearing panel established under this section shall not be subject to further administrative review. Following referral by the division, the hearing examiner or medical hearing panel shall have jurisdiction to hear and decide all issues related to the written notice of objection filed pursuant to W.S. 27–14–601(k). Different medical hearing panels with different membership may be selected to hear different cases, but a panel may hear more than one (1) case. Individual medical hearing panels shall be selected by the executive secretary under the supervision and guidance of the chairman of the medical commission. At least one (1) member of each panel shall be a physician. One (1) member shall be designated by the executive secretary to serve as chairman of the panel. When hearing a medically contested case, the panel shall serve as the hearing examiner and shall have exclusive jurisdiction to make the final administrative determination of the validity and amount of compensation payable under this act. For cases referred to the medical commission as small claims hearings under W.S. 27–14–602(b), the medical hearing panel may consist of one (1) physician who shall serve as the hearing examiner and shall have exclusive jurisdiction to make the final administrative determination of the validity and amount of compensation payable under this act.

(c) The members of the commission and of medical hearing panels when serving shall be immune from liability and shall be defended by the attorney general if sued and indemnified against loss from legal action in the same manner as state employees.

(d) The division shall establish a fee schedule for the compensation of members of the medical commission and medical hearing panels for their professional services to be paid from the worker's compensation account.

(e) Upon agreement of all parties to a case, the hearing examiner in a contested case under this chapter may transfer a medically contested case to a medical hearing panel or may seek the advice of the medical commission on specified medical issues in the contested case. The advice shall be in writing and shall become part of the record of the case.

Wyo. Stat. Ann. § 27–14–616 (LexisNexis 2007).

[¶ 12] Wyo. Stat. Ann. § 27–14–602(b)(ii) (LexisNexis 2007) (emphasis added) provides:

(ii) All other requests for hearing not specified under paragraph (b)(i) of this section shall be conducted as a contested case in accordance with procedures of the Wyoming Administrative Procedure Act and the Wyoming Rules of Civil Procedure as applicable under rules of the office of administrative hearings. The hearing examiner designated by the office of administrative hearings shall render a decision in a contested case within thirty (30) days after the close of the record. If the contested

case is heard by the hearing panel created pursuant to W.S. 27–14–616(b)(iv), *the panel shall render a decision within forty-five (45) days after the close of the record;* . . . .

[¶ 13] All other worker's compensation case disputes are resolved before hearing examiners, which were created in 1992, as established in the following legislation:

§ 9–2–2201. **Office created; appointment of director and hearing examiners.**

(a) The office of administrative hearings is created as a separate operating agency pursuant to W.S. 9–2–1704(d).

(b) The governor, with the advice and consent of the senate, shall appoint a director of the office who shall serve as the administrative head of the office and as chief hearing examiner. Unless sooner removed, the director's term of appointment expires at the end of the term of office of the governor during which he was appointed. The director serves at the pleasure of the governor and may be removed by him as provided by W.S. 9–1–202. The director shall be a member in good standing of the Wyoming state bar.

(c) The director may appoint additional hearing examiners who are members in good standing of the Wyoming state bar to serve either full or part time as necessary throughout the state. Hearing examiners serve at the pleasure of the director and may be removed by him at any time without cause.

§ 9–2–2202. **Duties and function of office.**

(a) The office of administrative hearings is the successor agency to the office of independent hearing examiners created by W.S. 27–14–602 and the office of hearing examiners created by W.S. 31–7–105. Effective July 1, 1992:

(i) There is transferred to the office of administrative hearings all positions, personnel, property and appropriated funds of the office of independent hearing examiners and the office of hearing examiners;

(ii) The office of administrative hearings shall assume all duties and responsibilities and exercise all authority of the office of independent hearing examiners and the office of hearing examiners set out in title 27, chapter 14 and title 31, chapters 6, 7, 9 and 17 of the Wyoming statutes.

(b) In addition to conducting hearings pursuant to subsection (a) of this section, the office of administrative hearings may, if requested, provide hearing services for any other state agency, provided:

(i) Hearing services shall be provided to other agencies subject to available resources;

(ii) The cost of the hearing services as determined by the director of the office of administrative hearings shall be paid by the requesting agency to the office of administrative hearings;

(iii) Hearings will be conducted in an impartial manner pursuant to the Wyoming Administrative Procedure Act, applicable provisions of the Wyoming Rules of Civil Procedure and any rules for the conduct of contested cases adopted by the director of the office of administrative hearings which shall take precedence over hearing rules promulgated by the requesting agency. In the case of personnel hearings conducted pursuant to W.S. 9–2–1019, the state personnel rules shall govern the conduct of the hearings;

(iv) Hearings may be held in any area of the state giving consideration to the resources of the office of administrative hearings and the convenience of the parties.

Wyo. Stat. Ann. §§ 9–2–2201 and 9–2–2202 (LexisNexis 2007).

[¶ 14] Hearing examiners also perform quasi-judicial functions. Whether a case is before a hearing examiner or before a hearing panel assigned by the Medical Commission for a particular case, the trial-type proceedings are about the same. All testimonial evidence and all trial proceedings are taken down verbatim by a court reporter. All documentary evidence is included in the record. The hearing examiner or Medical Commission hearing panel is required to issue a detailed order which contains a complete recitation of the finding of facts it made and the conclusions of law it reached. *See, e.g., Decker I,* ¶¶ 25–28, 124 P.3d at 694–95.

[¶ 15]   Some of our most important principles of statutory construction apply to the analysis of this issue:

> In interpreting statutes, our primary consideration is to determine the legislature's intent.   All statutes must be construed in *pari materia* and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony.   Statutory construction is a question of law, so our standard of review is de novo.   We endeavor to interpret statutes in accordance with the legislature's intent.   We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection.   We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute in *pari materia.*   When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction.

*BP America Prod. Co. v. Dep't of Revenue, State of Wyo.,* 2005 WY 60, ¶ 15, 112 P.3d 596, 604 (Wyo.2005).

[¶ 16]   Moreover:

> We presume that statutes are enacted by the legislature with full knowledge of existing law, so we construe statutes in harmony with existing law, particularly other statutes relating to the same subject or having the same purpose....
>
> Statutes must be construed so that no portion is rendered meaningless.... Interpretation should not produce an absurd result.... We are guided by the full text of the statute, paying attention to its internal structure and the functional relation between the parts and the whole.... Each word of a statute is to be afforded meaning, with none rendered superfluous.... Further, the meaning afforded to a word should be that word's standard popular meaning unless another meaning is clearly in-

> tended.... If the meaning of a word is unclear, it should be afforded the meaning that best accomplishes the statute's purpose.... We presume that the legislature acts intentionally when it uses particular language in one statute, but not in another.... If two sections of legislation appear to conflict, they should be given a reading that gives them both effect.

*Hede v. Gilstrap,* 2005 WY 24, ¶ 6, 107 P.3d 158, 163 (Wyo.2005) (quoting *Rodriguez v. Casey,* 2002 WY 111, ¶¶ 9–10, 50 P.3d 323, 326–27 (Wyo.2002)).

[¶ 17]   There are many bases upon which this Court might conclude that the Medical Commission hearing panels are not required by the PMA to permit parties or the public to sit in on their deliberations.   To begin with, a Medical Commission hearing panel is not an "agency" as that word is used in the PMA. An "agency" is defined as "any authority, bureau, board, commission, committee, or subagency of the state, a county, a municipality or other political subdivision which is created by or pursuant to the Wyoming constitution, statute or ordinance, other than the state legislature and the judiciary." § 16–4–402(ii).   Individual medical hearing panels do not fit within this definition.   They are impermanent bodies not created by the legislature.   Certainly the legislature has provided for their potential existence, but their actual existence is governed solely by the Medical Commission.

[¶ 18]   The legislature created the Medical Commission and empowered it to assemble medical hearing panels solely as necessary to hear medically contested worker's compensation cases.   "Different medical hearing panels with different membership may be selected to hear different cases." § 27–14–616(b)(iv).   Indeed, the Medical Commission attempts to individualize panels by appointing commission members with expertise relevant to the circumstances of the case being heard.   Wyo. Dep't of Employment, Workers' Compensation, Medical Commission Rules & Regulations, ch. 6, § 1(b) (Feb. 14, 2003).[1]   As a consequence, poten-

---

1.   Medical hearing panels operate under the Rules and Regulations promulgated by the Medical Commission.

tially, multiple medical hearing panels may exist at any given time. Equally, it is possible that there might be a time when no medical hearing panel exists because there are no outstanding medically contested cases to be heard. A medical hearing panel, being a transitory body, and existing and operating exclusively under the auspices of the Medical Commission, does not fall within the definition of "agency" as used in the PMA.

[¶ 19] Moreover, even if a Medical Commission hearing panel were to be considered an "agency," a decision by the panel is not an "action" as that word is used in the PMA. A hearing panel is not a "governing body" as that phrase is used in the PMA. A quasi-judicial hearing conducted by a hearing panel is not a "meeting" as that word is used in the PMA. Finally, as noted above, a hearing panel may deliberate for forty-five days and then its decision must be forthcoming in written form. It makes no sense to read the PMA so as to require a hearing panel to curtail its deliberative process to a few minutes at a quasi-judicial hearing, when the statutes that created those hearing panels contemplated that they may deliberate over a period of forty-five days after pondering the often voluminous and very technical medical testimony and records that make up the evidence at such quasi-judicial hearings. Because a Medical Commission hearing panel is not an "agency" and its decisions are not "actions" as defined by the PMA, the hearing panels are not subject to the strictures of the PMA.

*Presentation of Additional Evidence*

[¶ 20] Mr. Decker also suggests the Medical Commission violated his due process rights on remand by not allowing him to present additional evidence. Mr. Decker's due process rights, however, were not implicated by the procedure used in this case. Mr. Decker had a full and fair opportunity to present his case during his hearing.

[¶ 21] On remand after *Decker I*, our mandate did not require the case be reopened to allow additional evidence. It only required the Medical Commission enter a new order more thoroughly explaining the reason for its denial of benefits based on the evidence adduced at the hearing so we could rationally review its decision.

[¶ 22] Mr. Decker argues that, in *Decker I*, we heightened his burden of proof and therefore he must be allowed to enter new evidence to meet that burden. Mr. Decker, however, conveniently misreads our discussion in *Decker I*. As we made clear in that discussion, we were simply identifying Mr. Decker's theory of his case as he presented it before the medical hearing panel.[2] We altered nothing. Mr. Decker seems to be opportunistically attempting to get a second bite at the apple. The refusal by the Medical Commission to allow him his second bite certainly raises no due process concerns.

### Substantial Evidence

[¶ 23] In an appeal from a district court's decision on a petition for review of administrative action, we afford no deference to the district court's decision. Rather, we review the case as if it came directly from the agency. *McIntosh v. State ex rel. Wyoming Medical Comm'n*, 2007 WY 108, ¶ 8, 162 P.3d 483, 487 (Wyo.2007); *Wright v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2007 WY 101, ¶ 6, 160 P.3d 1129, 1131 (Wyo.2007); *Bonsell v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2006 WY 114, ¶ 7, 142 P.3d 686, 688 (Wyo.2006). As in all administrative proceedings, our review is limited by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2007) to:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

\* \* \* \*

2. We found the theory presented to the medical hearing panel by Mr. Decker was "that his work materially aggravated his congenital condition." *Decker I*, ¶ 40, 124 P.3d at 698.

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

    (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

    \* \* \* \*

    (D) Without observance of procedure required by law; or

    (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

We do not defer to the agency's determination on issues of law; instead, we will correct any error made by the agency in either interpreting or applying the law. *McIntosh,* ¶ 8, 162 P.3d at 487.

[¶ 24] Mr. Decker argues the decision of the Medical Commission denying him benefits is not supported by substantial evidence. In reviewing findings of fact, we examine the entire record to determine whether there is substantial evidence to support an agency's findings. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence but can be less than the weight of the evidence. *Decker I,* ¶ 23, 124 P.3d at 694; *Wyoming Consumer Group v. Public Service Comm'n of Wyoming,* 882 P.2d 858, 860–61 (Wyo.1994); *Montana Dakota Utilities Co. v. Public Serv. Comm'n,* 847 P.2d 978, 983 (Wyo.1993).

[¶ 25] The Medical Commission's decision essentially is that the initial diagnosis of wrist tendonitis was correct and the condition completely resolved within a few months. The primary evidentiary support for this conclusion is the original diagnosis by Dr. Johnson of wrist tendonitis and Dr. Johnson's unconditional work release on December 5, 2001. The Medical Commission also finds the physical therapy notes from October to December 2001 support their conclusion that Mr. Decker's wrist tendonitis had resolved by early December. Finally, the Medical Commission relies upon the findings of Dr. Moress in his IME, specifically finding number six relating Mr. Decker's original complaints to wrist tendonitis and opining the

tendonitis would certainly have improved with time off work.

[¶ 26] This evidence, when viewed in the context of the record as a whole, is not substantial. Given the Medical Commission's theory of the case, the key question in this case is whether Mr. Decker's original symptoms were caused by wrist tendonitis or were symptoms of TOS. One fact the Medical Commission noted to support a diagnosis of wrist tendonitis instead of TOS was that, although working overhead is a known TOS aggravator, Mr. Decker did not develop symptoms immediately upon beginning work as a sheet metal worker, but rather over seven years later. This factor, however, is not necessarily significant to his TOS diagnosis in 2001. According to the deposition testimony of Dr. Schabauer, the physiology making a person susceptible to TOS may be present, indeed it could be considered a congenital condition, but symptoms are not always present.

[¶ 27] Another fact noted by the Medical Commission is that Mr. Decker's wrist pain began when he was working at waist level or below. Dr. Schabauer, who had Dr. Moress' IME report at the time of his deposition, was aware of this fact but it did not prevent him from diagnosing TOS attributed to Mr. Decker's work effort. Dr. Lockwood also was aware of the nature of the onset of symptoms yet he too agreed Mr. Decker suffered from TOS and his work effort aggravated his condition.

[¶ 28] Then there is Dr. Johnson's initial diagnosis of wrist tendonitis. However, when the complete notations from that first exam are read, they indicate Dr. Johnson's diagnosis of wrist tendonitis was not a definitive diagnosis but rather a differential diagnosis. Dr. Johnson wanted to see Mr. Decker again if physical therapy and other measures did not help and Mr. Decker was still symptomatic. Dr. Johnson made his initial diagnosis of wrist tendonitis on August 27, 2001. On September 17, 2001, at Mr. Decker's next visit, Dr. Johnson abandoned his diagnosis of wrist tendonitis. On September 28, 2001, a physical therapist administered tests to Mr. Decker and found no

signs of wrist tendonitis. During the search for a new diagnosis that involved at least five other doctors, there was no further mention of the possibility of wrist tendonitis.

[¶ 29] The evidence supporting a finding that Mr. Decker's original complaints were symptoms of TOS is overwhelming. Dr. Schabauer testified at his deposition that symptoms of TOS include wrist aching, whole arm aching, a degree of numbness, and heaviness of the arm. A chronological review of Mr. Decker's medical records, including his physical therapy records, indicates that Mr. Decker consistently complained of wrist and hand pain, pain radiating to the elbow, hand weakness and numbness. He complained of pain radiating into his elbow and hand weakness his first visit with Dr. Johnson on August 27, 2001. He complained of pain, weakness and numbness during his evaluation by the physical therapist the next day. The physical therapist found Mr. Decker showed "significant decrease in both strength and sensation in bilateral wrists and hands" and experienced "pain with overpressure in right elbow extension." During his examination with Dr. Johnson on September 17, Mr. Decker continued to have the same complaints: "He notes that on some days he will have very little pain and discomfort and then on other days he will have a significant amount of paresthesia and pain to the wrist area and fingers." Mr. Decker also mentioned to Dr. Johnson that he was "dropping objects" and he "experiencing pain radiating back to the elbow." These symptoms fit well within the rubric of TOS. We find the symptoms related from the beginning by Mr. Decker were symptoms of TOS and not wrist tendonitis.

[¶ 30] The remaining question is whether Mr. Decker has adequately proven his TOS symptoms were caused by his work effort. The causal connection between an accident or condition at the workplace is satisfied if the medical expert testifies that it is more probable than not that the work contributed in a material fashion to the precipitation, aggravation or acceleration of the injury:

> We do not invoke a standard of reasonable medical certainty with respect to such causal connection. *Kaan v. State ex rel. Wyoming Worker's Compensation Div.,* 689 P.2d 1387, 1389 (Wyo.1984) (citing *Jim's Water Service v. Eayrs,* 590 P.2d 1346 (Wyo.1979)). Testimony by the medical expert to the effect that the injury "most likely," "contributed to," or "probably" is the product of the workplace suffices under our established standard. *Kaan,* 689 P.2d at 1389.

*In re Pino,* 996 P.2d 679, 685 (Wyo.2000). *See Huntington v. State ex rel. Wyoming Workers' Comp. Div.,* 2007 WY 124, ¶ 11, 163 P.3d 839, 842 (Wyo.2007); *Ramos v. State ex rel. Wyoming Workers' Safety and Comp. Div.,* 2007 WY 85, ¶ 18, 158 P.3d 670, 677 (Wyo.2007).

[¶ 31] The Medical Commission concluded that Mr. Decker's work effort was not a materially aggravating factor in his TOS for two primary reasons: the symptoms did not begin until after he had been working for over seven years; and the symptoms did not improve after he quit working. The first issue is best answered by addressing factors that had changed in Mr. Decker's life that may have precipitated the onset of symptoms in 2001. The most obvious change for our purposes is his change in employment. Mr. Decker's new employment required him to work longer hours without an assistant. The result was much greater overhead exertion, a known aggravating factor for TOS. The Medical Commission relied on other aggravating factors as well, such as poor posture and an unknown increase in weight prior to the onset of his wrist pain. However, it must be remembered we do not weigh possible aggravating factors. *Decker I,* ¶ 40, 124 P.3d at 698–99; *In re Boyce,* 2005 WY 9, ¶ 11, 105 P.3d 451, 455 (Wyo.2005) (there is no authority requiring a medical expert to apportion the aggravation between work conditions and other possible contributing factors).

[¶ 32] The second issue also brings into question the possible existence of other aggravating factors. Again, the only question is whether Mr. Decker's employment was a material aggravating factor, in and of itself, in Mr. Decker's condition. The issue was addressed by Dr. Schabauer in his deposition. He testified that symptoms of TOS

change over time. While symptoms can be debilitating when a person is engaged in materially aggravating activity, such as working overhead, TOS symptoms can also be elicited with fairly simple activities. Most importantly, he testified that, even if a person suffering from TOS does everything correctly, "uniformly people with thoracic outlet do not become 100 percent better." We find the import of Dr. Schabauer's testimony to be that the progression of symptoms of TOS are unpredictable. We therefore find the heavy reliance by the Medical Commission on what they deem to be an increase in symptoms for the purpose of determining causation to be lacking in evidentiary support.[3]

[¶ 33] Finally, and most importantly, several doctors opined that the repetitive overhead exertion required of Mr. Decker in his job was an aggravating factor in his complaints. The Medical Commission decided to discount the opinions on causation of Mr. Decker's treating physicians because they did not have all the relevant, accurate patient history. We disagree with this conclusion as it regards Dr. Schabauer. At the time of his deposition, Dr. Schabauer had received and reviewed a copy of Dr. Moress' IME report. Thus, he had a review of the complete medical history of Mr. Decker. Even after receiving that information, Dr. Schabauer continued to opine that Mr. Decker suffered from TOS, which was aggravated by his overhead work activities.

[¶ 34] In any event, the Medical Commission's credibility determination does not apply to Dr. Lockwood. Dr. Lockwood performed the first IME on Mr. Decker in July 2002. As the Medical Commission stated, Dr. Lockwood had all the medical records from previous treating physicians. After reviewing the records, and examining Mr. Decker, Dr. Lockwood opined that Mr. Decker suffered from TOS and "that it is reasonable and probable that work activities ... aggravated his overall condition."

## CONCLUSION

[¶ 35] The Medical Commission followed the proper procedures on remand from Deck-

er I. The Public Meetings Act did not require the Medical Commission to allow Mr. Decker to attend new deliberations as argued by Mr. Decker. There was also no requirement for the Medical Commission to reopen the hearing for the taking of additional evidence. The Medical Commission was well within its discretion to simply enter a new, more thorough order explaining its position and the reasons therefore.

[¶ 36] The decision of the Medical Commission denying benefits to Mr. Decker for a work-related aggravation of symptoms related to TOS is not supported by substantial evidence when viewed on the record as a whole. The order denying benefits is hereby reversed. This case is remanded for further proceedings consistent with this opinion.

GOLDEN, J., delivers the opinion of the Court; KITE, J., files a dissenting opinion, in which VOIGT, C.J., joins.

KITE, J., dissenting, in which VOIGT, C.J., joins.

[¶ 37] I dissent from the majority opinion because I believe Wyoming's Public Meetings Act, Wyo. Stat. Ann. § 16–4–401, et seq. (LexisNexis 2007), applies to the deliberations of Medical Commission panels and the panel in this case violated the law when it closed its deliberations to the public. The Public Meetings Act requires:

(a) All meetings of the governing body of an agency are public meetings, open to the public at all times, except as otherwise provided. No action of a governing body of an agency shall be taken except during a public meeting following notice of the meeting in accordance with this act. Action taken at a meeting not in conformity with this act is null and void and not merely voidable.

Section 16–4–403(a). The following definitions help delineate the scope of the Public Meetings Act:

(i) "Action" means the transaction of official business of an agency including a collective decision of a governing body, a

---

3. It is also inconsistent with the Medical Commission's determination that Dr. Johnson's December 5, 2001, unconditional work release indicates Mr. Decker's symptoms had resolved.

collective commitment or promise by a governing body to make a positive or negative decision, or an actual vote by a governing body upon a motion, proposal, resolution, regulation, rule, order or ordinance;

(ii) "Agency" means any authority, bureau, board, commission, committee, or subagency of the state, a county, a municipality or other political subdivision which is created by or pursuant to the Wyoming constitution, statute or ordinance, other than the state legislature and the judiciary;

(iii) "Meeting" means an assembly of at least a quorum of the governing body of an agency which has been called by proper authority of the agency for the purpose of discussion, deliberation, presentation of information or taking action regarding public business[.]

Section 16–4–402(a). The majority opinion concludes that the Public Meetings Act does not apply to deliberations of the Medical Commission panels because an individual panel is not an "agency."

[¶ 38] In order to determine whether Medical Commission panels fall within the definition of "agency" for application of the Public Meetings Act, we look to the statutes pertaining to the Medical Commission. The Medical Commission exists by authority of the legislature, and its members are appointed by the governor. Wyo. Stat. Ann. § 27–14–616 (LexisNexis 2007). The Medical Commission is authorized to promulgate its own rules and regulations under the Administrative Procedure Act. *Id. See also,* § 16–3–102; *Rules and Regulations of the Medical Commission* § 1 (available at http://soswy.state.wy.us/Rules/RULES/5036.pdf).

[¶ 39] Section 27–14–616(b)(iv) states that the duties of the Medical Commission shall include:

(iv) To furnish three (3) members of the commission to serve as a medical hearing panel to hear cases referred for hearing. The division shall refer medically contested cases to the commission for hearing by a medical hearing panel.... Following referral by the division, the hearing examiner or medical hearing panel shall have jurisdiction to hear and decide all issues related to the written notice of objection

filed pursuant to W.S. 27–14–601(k). Different medical hearing panels with different membership may be selected to hear different cases, but a panel may hear more than one (1) case. Individual medical hearing panels shall be selected by the executive secretary under the supervision and guidance of the chairman of the medical commission. At least one (1) member of each panel shall be a physician. One (1) member shall be designated by the executive secretary to serve as chairman of the panel. When hearing a medically contested case, the panel shall serve as the hearing examiner and shall have exclusive jurisdiction to make the final administrative determination of the validity and amount of compensation payable under this act.

[¶ 40] The Medical Commission is, therefore, permitted to assemble panels to hear individual medically contested worker's compensation cases. In non-medically contested cases, a hearing examiner from the Office of Administrative Hearings, which was also created by statute, hears and decides the case. Wyo. Stat. Ann. §§ 9–2–2201, 27–14–602 (LexisNexis 2007). The Medical Commission panels have the same authority as hearing examiners to "hear and decide all issues" raised in the case. Considering the plain language of the relevant statutes in the context of the entire scheme of worker's compensation contested cases, the Medical Commission panels clearly fall within the definition of an agency under § 16–4–402(a)(ii). Although individual panels are selected for certain cases and then disbanded, when a panel is performing its statutory function, there is simply no question that it is an "authority, bureau, board, commission, committee, or subagency of the state." *Id.*

[¶ 41] Moreover, the majority opinion is internally inconsistent. The opinion concludes that the Public Meetings Act does not apply to the Medical Commission panel because it is not an agency and, yet, the opinion reviews the panel's decision by applying Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2007) of the Wyoming Administrative Procedures Act. Section 16–3–114(a) articulates the method by which administrative agency decisions are judicially reviewed:

(a) Subject to the requirement that administrative remedies be exhausted and in the absence of any statutory or common-law provision precluding or limiting judicial review, **any person aggrieved or adversely affected in fact by a final decision of an agency in a contested case, or by other agency action or inaction, or any person affected in fact by a rule adopted by an agency, is entitled to judicial review** in the district court. . . .

(emphasis added). The judicial review provision of § 16–3–114(a) applies only to agency action. If the Medical Commission panel's decision was not an agency action, as the majority opinion concludes, there is no basis for judicial review of that decision under the Administrative Procedures Act.

[¶ 42] A determination that the medical panel is an agency does not completely determine whether the Public Meetings Act applies to the deliberations of the panel. The Medical Commission claims that the panel's deliberations were exempt from the requirements of the Public Meetings Act in that they did not occur during a "meeting" as defined by § 16–4–402(a)(iii) because the panel does not make up a "quorum of the governing body of an agency." *Id.*

[¶ 43] The Medical Commission consists of 11 members and up to 11 "associate members." Section 27–14–616(a), (b). The function of associate members is limited to service on medical review panels. Section 27–14–616(b). Although the associate members do not participate in the other business of the Medical Commission, they do have complete authority to decide medically contested cases. Section 27–14–616(b)(iv).

[¶ 44] A quorum is "the number of the members of an organized body of persons . . . that when duly assembled is legally competent to transact business in the absence of the other members." *Webster's Third New Int'l Dictionary* 1868 (1993). Issuing decisions on medically contested cases is the statutorily enumerated "business" of the Medical Commission. Section 27–14–616(b)(iv). A panel of three members of the Medical Commission is authorized by statute to transact that business, and is therefore legally competent to do so. *Id.* Consequent-ly, a panel of three members of the Medical Commission is a quorum of the governing body of an agency for purposes of application of the Public Meetings Act.

[¶ 45] The Medical Commission also contends that it is entitled to meet to deliberate in private under the executive session exception in § 16–4–405(a)(ix):

(a) A governing body of an agency may hold executive sessions not open to the public:

. . . .

(ix) To consider or receive any information classified as confidential by law[.]

[¶ 46] Initially, it must be noted that the record does not indicate the panel called an executive session. Section 16–4–405(c) provides: "Unless a different procedure or vote is otherwise specified by law, an executive session may be held only pursuant to a motion that is duly seconded and carried by majority vote of the members of the governing body in attendance when the motion is made." Section 16–4–405(b) requires that "[m]inutes shall be maintained of any executive session." The record does not reflect that either of those requirements was fulfilled here.

[¶ 47] Moreover, the matter at issue in this case did not qualify for consideration in executive session. The Medical Commission directs us to Wyo. Stat. Ann. § 27–14–805 (LexisNexis 2007) for authority that the information discussed at Medical Commission panel hearings is confidential, and thus may be debated in an executive session. Section 27–14–805(a) states:

Except as otherwise provided by this act, information obtained from any employer or covered employee pursuant to reporting requirements under this act or investigations conducted under W.S. 27–14–803 shall not be disclosed in a manner which reveals the identity of the employer or employee except to the employer, the employee, legal counsel for an employer, legal counsel for an employee or in situations necessary for the division to enforce any of the provisions of this act.

[¶ 48] The statute prohibits the Workers' Compensation Division (Division) from dis-

closing identifiable information obtained "pursuant to reporting requirements under this act or investigations conducted under W.S. 27–14–803." *Id.* The Division is permitted by statute to collect sensitive personal information in the interests of public safety, and the section prohibiting disclosure is an appropriate directive to protect that information. Wyo. Stat. Ann. § 27–14–501 (Lexis-Nexis 2007); Wyo. Stat. Ann. § 27–14–506 (LexisNexis 2007); Wyo. Stat. Ann. § 27–14–803 (LexisNexis 2007).

[¶ 49] Information gathered by the Division pursuant to reporting requirements is distinguishable from the information before the Medical Commission because the employer and employee are required to report it. In contrast, information presented to the Medical Commission in a contested case hearing is presented pursuant to a claim made by the employee. In choosing to avail himself of the system, the employee waives his right to maintain the privilege as to information relevant to the resolution of his case. *See Wardell v. McMillan*, 844 P.2d 1052, 1066 (Wyo.1992) ("When a patient places his physical or mental condition into contest, the physician-patient privilege is waived to the extent that it is relevant to the controversy.") and *Frias v. State*, 722 P.2d 135, 140 (Wyo. 1986) ("Waiver also occurs when a party voluntarily inserts the issue of his physical condition into the litigation."). Section 27–14–805 prevents the disclosure of personal information gathered by the Division, not information presented by a claimant in a contested case proceeding. Applying the Medical Commission's logic to the panels would allow closure, not just of the deliberations, but of the hearings and all other proceedings, as the information contained in those proceedings is the same as that discussed in deliberations. That result is not consistent with the Medical Commission's practice and nothing in the statutes indicates it is what the legislature intended. There-

fore, I would conclude the non-disclosure requirement of § 27–14–805 does not allow deliberations by the Medical Commission's hearing panels to be held in executive session.[4]

[¶ 50] In summary, I would hold that the Medical Commission panels fit the statutory definition of "agency" under § 16–4–402(a)(ii). Deliberations of a panel constitute a "meeting" under § 16–4–402(a)(iii) where "action" is taken. Section 16–4–402(a)(i). Therefore, the deliberations of the Medical Commission's hearing panels must be held in conformity with the requirements of the Public Meetings Act. Action taken in contravention of the Public Meetings Act is void. Section 16–4–403. Because the hearing panel violated the law by deliberating in private, its order is void and we have nothing to review. I would, therefore, remand this case to the Medical Commission for consideration using proper procedures under the Public Meetings Act.

---

4. The Medical Commission also cites to federal case law indicating that the deliberative process should be closed to the public to allow free and open debate among the panel members. *See, e.g., NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *Casad v. United States Dep't of Health and Human Serv's,* 301 F.3d 1247 (10th Cir.2002). Those cases are

not persuasive authority on the issue presented here because they concerned the federal Freedom of Information Act (FOIA), 5 U.S.C. § 552, not the Wyoming Public Meetings Act. Moreover, the Public Meetings Act does not contain provisions comparable to those discussed in the cited cases.